# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

GEORGE ALLEN JR.,       )
        )
and           )
        )
LONZETTA TAYLOR,      )
        )
     Plaintiffs,     )    Case No
        )
v.           )    Division No.
        )
THE CITY OF ST. LOUIS, MISSOURI,  )    **JURY TRIAL DEMANDED**
        )
and           )
        )
RICHARD GRAY, BETTYE BATTLE-TURNER,  )
THOMAS IRWIN, ERWIN O. SWITZER, in their  )
official capacities as members of the St. Louis City  )
Board of Police Commissioners, and MAYOR  )
FRANCIS G. SLAY, in his official capacity as an  )
ex-officio member of the St. Louis City Board of  )
Police Commissioners,  )
        )
and           )
        )
D. SAMUEL DOTSON III,  )
in his official capacity as Chief of Police of the  )
ST. LOUIS METROPOLITAN POLICE  )
DEPARTMENT  )
     Serve at:  )
     City Hall  )
     1200 Market Street, Room 200  )
     St. Louis, MO 63103,  )
        )
and           )
        )
JOSEPH CROW, TERRY JAMES,  )
MARK BURFORD, HERBERT RILEY,  )
GERALD HART, WILLIAM J. WILSON,  )
THOMAS P. ROWANE, and ALOY LAGATES  )
in their official capacities and in their individual  )
capacities,  )
        )
     Defendants.    )

**COMPLAINT**

Plaintiffs GEORGE ALLEN JR. and LONZETTA TAYLOR, by their attorneys BRYAN CAVE LLP and NEUFELD, SCHECK & BRUSTIN, LLP, hereby allege as follows:

**INTRODUCTION**

1.     Plaintiff George Allen Jr., a man who has profound mental illness, including diagnosed paranoid schizophrenia, spent more than 30 years of his life incarcerated for the rape and murder of St. Louis court reporter Mary Bell—crimes he did not commit.

2.     Although no physical, forensic, or eye-witness evidence ever tied Mr. Allen to Ms. Bell's murder, Defendant officers of the St. Louis Metropolitan Police Department ("SLMPD") unlawfully arrested Mr. Allen, physically and psychologically coerced his confession, inadequately investigated the crime, fabricated evidence against Mr. Allen, suppressed exculpatory evidence, and ultimately ensured that Mr. Allen would be wrongfully convicted.

3.     Before Mr. Allen's arrest, Defendants had learned from the forensic evidence that Ms. Bell's killer had type B or AB blood; they also found several fingerprints at the scene, which they believed may have been left by the killer. Defendants relied on this forensic evidence to eliminate various suspects, including Ms. Bell's boyfriend and estranged husband.

4.     After weeks of investigation without success, Defendants happened upon Mr. Allen. At the time, Defendants were searching for a known sex offender named Kirk Eaton, who had been spotted in the area of Ms. Bell's apartment and disappeared shortly after the murder. Defendants Terry James and Mark Burford initially mistook Mr. Allen for Mr. Eaton. Although Mr. Allen produced identification showing that he was not Kirk Eaton, on the basis of this alleged connection James and Burford nevertheless arrested Mr. Allen and brought him in for questioning.

5.     The first person to interrogate Mr. Allen, Officer Pamela LaRose, quickly recognized that Mr. Allen suffered from serious mental illness and that he could be easily

2

manipulated into making unreliable admissions. Accordingly, she terminated the interview and never considered Mr. Allen a suspect for any crime.

6.    Defendants James, Burford, and Herbert Riley, however, saw an opportunity to close what had become an emotionally charged case for the St. Louis law enforcement community. These Defendants interrogated Mr. Allen for several hours, using physical and psychological pressure to coerce him into confessing. When Mr. Allen truthfully told them that he knew nothing about the crime—because he was innocent—they fed him details. When Mr. Allen expressed confusion, Defendants pressured and cajoled him until he ultimately succumbed and falsely confessed.

7.    Having successfully coerced Mr. Allen, Defendants then conducted a much shorter official interrogation, which they taped. Even independent of Defendants' prior coercion, the taped confession itself is facially unreliable. Other officers in the SLMPD regarded Mr. Allen's taped confession as "iffy" and prosecutors publicly admitted that investigators remained "cautiously suspicious."

8.    After obtaining his taped confession, Defendants learned that Mr. Allen could not have contributed the unidentified type B or AB body fluids or any of the numerous unidentified fingerprints found at the crime scene. Rather than excluding Mr. Allen as a suspect on this basis—as they had for other suspects—Defendants suppressed exculpatory evidence and fabricated evidence to make their case against Mr. Allen stick. They doctored and suppressed reports in order to conceal evidence that the perpetrator had type B or AB blood, and to claim that the unidentified fingerprints were unusable. Moreover, in order to bolster the patently unreliable false confession, the individual Defendants fabricated corroborating evidence, so that they could falsely claim that Mr. Allen had volunteered nonpublic information that only the true perpetrator would know.

9.      Based on the coerced false confession and the fabricated corroborating evidence—but without the exculpatory forensic evidence, which Defendants suppressed—Mr. Allen was prosecuted and convicted.

10.     Throughout his incarceration, Mr. Allen maintained his innocence. In 1997, in response to Mr. Allen's repeated requests for DNA testing, St. Louis officials wrongly informed Mr. Allen and his representatives that no biological evidence was available for DNA testing. Nevertheless, Mr. Allen and his family refused to give up. Despite further delays and false information, Mr. Allen eventually obtained post-conviction DNA testing. This testing would eventually prove that Mr. Allen was not the source of any of the biological evidence found at the scene of Ms. Bell's murder.

11.     While advocating for Mr. Allen's exoneration, Mr. Allen's counsel discovered that critical, exculpatory evidence continued to be withheld from Mr. Allen during the course of the exoneration proceedings. This evidence, too, established Mr. Allen's innocence.

12.     Finally, in 2012, approximately 15 years after he first sought testing, Mr. Allen's conviction was vacated and the indictment dismissed.

13.     As a result of Defendants' unconstitutional and conspiratorial actions, Mr. Allen lost more than three decades of freedom, and Mary Bell's murder remains unsolved to this day.

14.     While Defendants' coercion of witnesses and fabrication of evidence is appalling, it was no aberration. The SLMPD had a pattern and practice of using unconstitutional means to fabricate evidence, including without limitation coercing witnesses, failing to disclose exculpatory evidence, failing to conduct adequate investigations, and failing to adequately train, supervise, and discipline officers in critical law enforcement responsibilities. As a result, numerous

4

individuals, like Mr. Allen, were incarcerated for decades for heinous crimes which they did not commit.

## JURISDICTION

15.     Jurisdiction is conferred by 28 U.S.C. § 1343, which provides for original jurisdiction of this Court in suits authorized under 42 U.S.C. § 1983 to redress the deprivation (under color of state law, statute, ordinance, regulation, custom, or usage) of any right, privilege, or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of citizens of all persons within the jurisdiction of the United States.

16.     Supplemental jurisdiction over Mr. Allen's state law claims exists pursuant to 28 U.S.C. § 1367(a).

## VENUE

17.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of Missouri, the judicial district in which the claims arose.

## JURY DEMAND

18.     Pursuant to the Seventh Amendment of the United States Constitution, Mr. Allen requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

### PLAINTIFFS

19.     Plaintiff George Allen is a resident of the State of Missouri. He currently resides with his mother in University City. On July 23, 1983, he was wrongfully convicted of rape and murder, and wrongfully sentenced to serve 95 years in the Missouri Department of Corrections.

20.     Plaintiff Lonzetta Taylor is also a resident of the State of Missouri, currently residing in University City. She is George Allen's mother.

## DEFENDANTS

21.     Defendant the City of St. Louis, Missouri ("St. Louis" or the "City"), is a municipal corporation, physically situated in this judicial district. St. Louis is responsible for establishing overall policy, overseeing operations, supervising, and otherwise employing the SLMPD and its members, law enforcement officers, and agents. As of at least September 1, 2013, the City accepted and assumed responsibility, ownership, and liability as successor-in-interest for contractual obligations, indebtedness, and other obligations of the St. Louis City Board of Police Commissioners.

22.     Until September 1, 2013, defendant the St. Louis City Board of Police Commissioners ("the St. Louis Board"), either itself and/or acting in concert with the City, was also responsible for establishing overall policy, overseeing operations, supervising, and otherwise employing the SLMPD and its members, law enforcement officers, and agents. The St. Louis Board is comprised of Defendants Mayor Francis G. Slay, Richard Gray, Bettye Battle-Turner, Thomas Irwin, and Erwin O. Switzer. These Defendants are sued as members of the St. Louis Board in their official capacities only, for the improper policies and practices of the SLMPD that contributed to the violations alleged herein.  On information and belief, the St. Louis Board continues to exist, although, on information and belief, it is no longer responsible for overseeing the SLMPD's current operations.

23.     Colonel D. Samuel Dotson III is the current Chief of Police of the SLMPD. Colonel Dotson became Chief of Police in or about January 2013.  In conjunction with St. Louis and the St. Louis Board, the Chief of Police is responsible for establishing overall policy, overseeing operations, supervising, and otherwise employing the SLMPD and its members, law enforcement officers, and agents. The Chief of Police manages the daily operations of the SLMPD and implements the St. Louis Board's and the City's policies and goals.  Colonel Dotson is sued solely in

his official capacity as Chief of Police of SLMPD relating to the improper policies and practices of the SLMPD that contributed to the violations alleged herein.

24.     Defendant Joseph Crow, upon information and belief, is a resident of the State of Missouri and this judicial district.  At all times relevant herein, he was a Criminalist in the SLMPD's Crime Laboratory, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of St. Louis, the St. Louis Board, the SLMPD, and the State of Missouri.

25.     Defendant Terry James, upon information and belief, is a resident of the State of Missouri and this judicial district. At all times relevant herein, he was an Officer with the SLMPD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of St. Louis, the St. Louis Board, the SLMPD, and the State of Missouri.

26.     Defendant Mark Burford, upon information and belief, is a resident of the State of Missouri and this judicial district. At all times relevant herein, he was an Officer with the SLMPD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of St. Louis, the St. Louis Board, the SLMPD, and the State of Missouri.

27.     Defendant Herbert Riley is deceased. Upon information and belief, prior to his death, Riley was a resident of the State of Missouri and this judicial district. At all relevant times herein, he was an SLMPD Homicide Detective acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of St. Louis, the St. Louis Board, the SLMPD, and the State of Missouri.

28.     Plaintiffs request that the Court appoint a Defendant ad litem for Defendant Riley.

29.     Defendant Gerald Hart is deceased. Upon information and belief, prior to his death, Hart was a resident of the State of Missouri and this judicial district. At all times relevant herein, he was a Fingerprint Examiner with the SLMPD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of St. Louis, the St. Louis Board, the SLMPD, and the State of Missouri.

30.     Plaintiffs request that the Court appoint a Defendant ad litem for Defendant Hart.

31.     Defendant William J. Wilson, upon information and belief, is a resident of the State of Missouri and this judicial district. At all times relevant herein, he was a Lieutenant with the SLMPD and Acting Commander of the Homicide Division acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of St. Louis, the St. Louis Board, the SLMPD, and the State of Missouri.

32.     Defendant Thomas P. Rowane, upon information and belief, is a resident of the State of Missouri and this judicial district. At all times relevant herein, he was a Section Supervisor with the SLMPD Homicide Division acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of St. Louis, the St. Louis Board, the SLMPD, and the State of Missouri.

33.     Defendant Aloy LaGates is deceased. Upon information and belief, prior to his death, LaGates was a resident of the State of Missouri and this judicial district. At all times relevant herein, he was a Detective Sergeant with the SLMPD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations,

policies, customs, and usage of St. Louis, the St. Louis Board, the SLMPD, and the State of Missouri.

34.    Plaintiffs request that the Court appoint a Defendant ad litem for Defendant LaGates.

35.    Defendants Crow, James, Burford, Riley, Hart, Wilson, Rowane, and LaGates, as members of the SLMPD, were employed by St. Louis and/or the St. Louis Board, and were acting under color of law within the scope of their employment at all times relevant herein. They are sued in both their individual and official capacities.

## FACTUAL ALLEGATIONS

### MARY BELL IS MURDERED

36.    On January 31, 1982, a historic snow storm blanketed the St. Louis area. By February 4, this storm—known as the "Big Snow"—had covered the St. Louis area with knee-deep levels of snow, or an estimated 20 inches. Life in the city essentially came to a near-halt for days: cars were snowed in and many roads were impassible.

37.    On February 4, Mary Bell was 31 years old and had worked as a court reporter for several years, including two years as a Grand Jury Court Reporter with the local Circuit Attorney's Office. She lived in her LaSalle Park apartment with her boyfriend, Russell Watters, a local attorney.

38.    At around 9:00 a.m. that morning, after Mr. Watters had left for work, Ms. Bell spoke to her mother on the telephone. Shortly thereafter, Frank Rankin, Ms. Bell's employer, called to see if Ms. Bell was available to work that day. After Ms. Bell confirmed that she was, Mr. Rankin agreed to call Ms. Bell later that morning with her assignment.

39.    Between 10:00 and 10:15 a.m., Pamela Ann Richardson, a colleague of Ms. Bell's, spoke with Ms. Bell by phone. Ms. Bell had just gotten out of the shower, so she briefly

put Ms. Richardson on hold in order to put on a robe. Ms. Richardson agreed to come by Ms. Bell's

apartment to drop off some work.

40.     By 10:30–10:45 a.m., when Mr. Rankin called Ms. Bell back, and when

Ms. Richardson arrived at Ms. Bell's apartment, Ms. Bell had seemingly vanished.  She did not

answer her door or the telephone.

41.     An attacker had entered Ms. Bell's apartment. In the kitchen, the perpetrator

obtained a large knife. The attack ended in the upstairs bedroom, where the perpetrator killed

Ms. Bell with the knife, stabbing her fourteen times in the back and neck, and inflicting five deep

incised wounds to her neck. The attacker left Ms. Bell lying naked between the bed and the wall. He

then took the knife, wrapped it in a towel, and placed it in a cooler in the foyer closet.

42.     Ms. Bell's body was discovered around 7:00 p.m. that evening, when

Mr. Watters returned to the apartment.

### MR. ALLEN DID NOT COMMIT THE MURDER

43.     Mr. Allen had absolutely no connection to Ms. Bell or to her murder.

44.     On February 4, 1982, at the time of Ms. Bell's murder, Mr. Allen was over 10

miles away in University City, where he lived with his mother and sister.

45.     That morning, Mr. Allen, like most St. Louisans, was confined to his home

and the immediate area as a result of the Big Snow. Mr. Allen's mother, Lonzetta Taylor, his sister,

and his sister's boyfriend were all present at the house with Mr. Allen during the time of Ms. Bell's

murder.

46.     Mr. Allen did not have his own car or access to anyone else's car, which he

would have needed to drive from University City, through the deep snow, to Ms. Bell's LaSalle Park

apartment. Even then it would have been difficult to make the trip: the officers who responded to a

call from Ms. Bell's apartment on February 4 were forced to walk a considerable distance after their vehicle became stuck in the snow.

### SLMPD's Initial Investigation of Ms. Bell's Murder

47.     When SLMPD officers and detectives arrived at Ms. Bell's apartment, they found a crime scene replete with forensic evidence. They removed a variety of items, including the bloody knife, bedding spotted with blood, a white nightgown from on the bed, and a robe from the floor in the kitchen. Defendant Rowane requested that the evidence be analyzed for forensic clues.

48.     Based on Ms. Bell's autopsy, Defendants believed she had been sexually assaulted by her killer. Although Ms. Bell's vagina was free of trauma, injuries to her anus, lower back and thigh were reported as consistent with sexual assault.

49.     As part of the forensic investigation, Defendant Crow performed serological testing on the crime scene and autopsy evidence. He reported that he had found semen under the victim's body, on a chair in the kitchen, on vaginal and rectal swabs, and various other items. This supported Defendants' belief that her killer had sexually assaulted Ms. Bell.

50.     The SLMPD also obtained at least twenty-seven useable fingerprints from the scene. Of these fingerprints, nineteen were matched to Mr. Watters, and one was matched to an SLMPD officer that responded to the scene on the day of the murder. SLMPD could not match seven of the useable prints that they obtained, including some from significant locations in the apartment—a flower pot on the window sill just feet from where Ms. Bell's body was found and a kitchen window sill overlooking the apartment's entrance. Defendants concluded that at least some of these prints had likely been left by Ms. Bell's killer.

51.     Defendants Wilson, Rowane, and LaGates were both personally involved and acted as supervisors over the SLMPD officers and investigators who conducted the investigation into Ms. Bell's murder.

## THE TWO BLOOD TYPES & THE SCAGGS MEMORANDUM

52.     Crow's most significant finding was the discovery of semen from individuals with <u>two different blood types</u>: one person with type B or AB blood who secreted B blood group antigens into his semen, and one person who had type A or O blood or was a non-secretor.[1] Crow recorded these findings in a handwritten Laboratory Worksheet.

53.     Crow found the type B or AB semen on Ms. Bell's robe, which she was wearing that morning when her attacker entered the apartment.

54.     Neither Ms. Bell boyfriend (Mr. Watters), nor her estranged husband (John Bell) had type B or AB blood.

55.     As a result, Crow concluded that it must have been Ms. Bell's attacker who left the type B or AB semen.

56.     Crow verbally reported this finding to SLMPD detectives, and this critical information was memorialized in a February 26, 1982 internal SLMPD memorandum written by Detective Ronald Scaggs ("the Scaggs Memo").

57.     The Scaggs Memo stated that the perpetrator of Ms. Bell's murder was believed to have type B or AB blood.

58.     The Scaggs Memo was distributed among the SLMPD supervisors involved in Ms. Bell's homicide investigation, including Lieutenant William J. Wilson, Sergeant Rowane, and Detective Sergeant Aloys LaGates. Wilson, Rowane, and LaGates were acting as supervisors with

---

[1] A person's ABO blood type is determined by the antigens found in the person's blood. There are three types of antigens—A, B, and H. The H antigen is present in everyone's blood. Type O blood contains only H antigens; type A blood contains A and H antigens; type B blood contains B and H antigens; type AB blood contains A, B, and H antigens. If a person is a "secretor," they secrete their antigens into other bodily fluids such as semen or saliva. A "non-secretor" does not exhibit antigens in bodily fluids other than their blood.

12

regard to the investigation into Ms. Bell's murder. The Scaggs Memo was also sent to Detective Herbert Riley, the lead detective assigned to Ms. Bell's murder.

### SLMPD BASELESSLY ARRESTS MR. ALLEN

59.     Based upon its initial investigation, SLMPD had a forensic picture of the crime and certain clues about the attacker, including that he had type B or AB blood, and that he may have left identifiable fingerprints at the scene. Over the next few weeks, Defendants and other members of the SLMPD used this evidence to rule out various suspects.

60.     After several weeks had passed without any other leads, the SLMPD focused its investigation on Kirk Eaton, an African-American man who had recently been released from prison after serving time for a rape conviction. Eaton had been spotted in the area of Ms. Bell's apartment complex around the time of the murder, and Eaton's brother lived in the same complex as Ms. Bell.

61.     On the morning of March 14, 1982—some six weeks after the crime— Mr. Allen was walking down the street roughly ten blocks away from Ms. Bell's apartment when he was stopped by Defendants James and Burford. The Defendants stopped Mr. Allen because they thought he matched Eaton's description—like Eaton, Mr. Allen is African-American.

62.     Although Mr. Allen produced several documents bearing his name, Defendants arrested Mr. Allen and brought him to the police station, purportedly to verify that he was not Eaton, but actually to interrogate him regarding various unsolved crimes.

### POLICE TRAINING REGARDING INTERROGATION OF THE MENTALLY ILL

63.     It is apparent upon meeting Mr. Allen that he is profoundly mentally ill. Since age 18, Mr. Allen has been intermittently hospitalized for mental health issues. At various points prior to his wrongful arrest and conviction, Mr. Allen was diagnosed with a range of illnesses including schizophrenia and schizoid personality disorder, and medicated as such.

13

64. Since well before 1982, minimally competent police officers have been trained to understand that psychological methods of interrogation can and sometimes do cause innocent individuals to falsely confess. It has also long been understood that people with mental illness are more likely to falsely confess because they are far more vulnerable to the pressures of interrogation, are more easily confused and disoriented, and are more likely to experience an irrational emotional or mental state.

65. At the time of Mr. Allen's arrest and interrogation, upon information and belief, SLMPD officers were taught this information and were instructed to be particularly careful when interrogating the mentally ill. SLMPD officers were taught, for example, that because mentally ill individuals are more easily swayed by manipulations of their emotions and expectations, interrogating officers should be particularly strict in their application of proper interrogation techniques.

66. At the time of Mr. Allen's interrogation, SLMPD officers were also taught to hold back details about the crime from the public and media, so that they could test the reliability of any later confession. If the suspect could reliably volunteer nonpublic information only the true perpetrator would know, that would tend to prove the confession's reliability. On the other hand, if the suspect could not provide any such nonpublic information, that would be a sign that the confession was unreliable. In order to make sure that the nonpublic facts came from the suspect, SLMPD officers were taught not to feed information to the suspect, either through leading questions or through actual photographs of the crime scene.

### DEFENDANTS COERCE MR. ALLEN INTO FALSELY CONFESSING

67. After arresting Mr. Allen, Defendants James and Burford brought him to the station for questioning.

14

68.     James and Burford first interrogated Mr. Allen with Officer Pamela LaRose of the SLMPD Sex Offenses division.

69.     Officer LaRose quickly concluded, consistent with her training, that due to Mr. Allen's obvious mental illness, he could easily be manipulated into confessing to crimes to which he had absolutely no connection. Recognizing that any purported confession would be unreliable, Officer LaRose terminated the interrogation and never considered Mr. Allen a suspect in any crime.

70.     Unable to convince Officer LaRose that Mr. Allen was involved in any crime, Defendants James and Burford next contacted Defendant Riley in order to interrogate Mr. Allen regarding Ms. Bell's murder.

71.     Defendants James, Burford, and Riley quickly determined that Mr. Allen was not Kirk Eaton. As such, they had no evidence whatsoever to connect Mr. Allen to Ms. Bell's murder.

72.     Mr. Allen told Defendants about his psychiatric problems and prior hospitalizations. Defendants James, Burford, and Riley also quickly realized that Mr. Allen was highly susceptible to suggestion, easily confused, likely to look to authority figures for cues on how to behave or what to say, and at significant risk of providing false information in response to even subtle police pressure.

73.     Knowing this, these Defendants continued the interrogation, intending to elicit a confession regarding Ms. Bell's murder.

74.     This interrogation—which was not taped—lasted two to three hours. Mr. Allen initially truthfully denied any connection with Ms. Bell's murder. It was also clear that Mr. Allen could not provide any information about the crime, because he was innocent and had no connection to the real killer. Based on proper training, Defendants should have quickly realized, as Officer LaRose had, that Mr. Allen was innocent.

75. Instead, Defendants physically and psychologically coerced Mr. Allen to confess. Defendants James, Burford, and Riley used physical coercion, repeatedly hitting Mr. Allen. Defendants psychologically coerced Mr. Allen as well: threatening him; rejecting his repeated denials; refusing to leave him alone; refusing him access to any friend, relative, or advisor; claiming that they had strong incriminating evidence falsely; promising leniency if he confessed; and telling him that he would be found guilty if he did not. Contrary to their training, Defendants also told Mr. Allen details about the crime.

76. After Defendants physically and psychologically coerced Mr. Allen for two to three hours, Mr. Allen eventually relented and indicated that he was willing to confess to Ms. Bell's murder.

### MR. ALLEN'S TAPED CONFESSION IS CLEARLY UNRELIABLE

77. Having overborne Mr. Allen's will and fed him information about the crime, Defendants then began taping their interrogation. The taped portion of the interrogation lasted about half an hour.

78. Even independent of what happened prior to the taped interrogation—such as the physical and psychological coercion and the repeated feeding of facts—Mr. Allen's taped confession itself is patently unreliable for several reasons.

79. First, Defendants failed to ask basic questions that would indicate actual guilt or innocence, such as obtaining an explanation of how Mr. Allen could have travelled ten miles from his home in University City to LaSalle Park on the day of the crime notwithstanding the crippling Big Snow.

80. Second, the tape makes clear that Mr. Allen was unable to provide even basic details about the crime without significant prodding from Defendants, sometimes through

photographs and other times through close-ended questions that incorporated factual details. For example:

    a.  After Mr. Allen initially stated that he left Ms. Bell's home immediately after having sex with her, Riley asked "when you started to go was she still screamin' or what was she doin'? Cause what's gonna keep her from screamin' if you left?" After Mr. Allen responded that he had hit Ms. Bell with his hand, Riley asked "Well, -- didn't use nothin' else? Think about it now." After continued denials that he used anything but his hand to hurt the victim, Riley directly asked Mr. Allen whether he stabbed the victim: "Didn't you cut her?" Mr. Allen stated that he didn't remember cutting the victim. Riley further asked, "Didn't you get somethin' from the house and cut her?" Allen responded: "What, like a knife from the kitchen? It might have happened that I hit her or something--." Mr. Allen then stated that he remembered having a very small knife called a "lady finger." In response, Riley stated, "No, I'm talkin' about somethin' that might be bigger than that." Mr. Allen continued to deny cutting the victim, and only began to admit to doing so after at least 40 questions asking him to admit the stabbing and after Riley implied in his questioning that the police had his fingerprints on the knife, telling Allen "We have the knife, you know. Do you remember if you touched the knife?" Mr. Allen ultimately stated that he stabbed Ms. Bell.

    b.  Detective Riley asked Mr. Allen about the towel in which the knife had been wrapped:

> Q: Did you pick up a towel while you was in the house?
> A: Yeah, I guess I did.
> Q: What color was it, do you remember?
> A: Um, I don't know.
> Q: Okay. Did you wrap anything in this towel?
> A: No.

81.    Third, many of Mr. Allen's taped "admissions" are inconsistent with the basic facts of Ms. Bell's murder known to police at the time. For example:

    a.  Mr. Allen stated that the crime occurred at night, around dusk.

        In fact, the crime occurred around mid-morning.

    b.  Mr. Allen stated that he hit the victim with his hand.

        In fact, no blunt force injuries were found on Ms. Bell.

17

c. Mr. Allen stated that the victim was around 20 or 25 years old, 5 feet 6 inches tall, and had dark hair.

In fact, Ms. Bell was 31 years old, 5 feet tall, and had blonde hair.

d. Mr. Allen stated if he stabbed the victim anywhere "it had to be on her chest."

In fact, Ms. Bell was stabbed in the back and neck and there were no stab wounds to her chest.

e. Mr. Allen stated that the knife was left on the floor.

In fact, SLMPD recovered the knife, wrapped in a towel, in a cooler inside of the foyer closet near the front door.

f. Mr. Allen stated that the victim obtained the knife from a drawer in the kitchen and that there were no other knives present.

In fact, SLMPD determined that the weapon came from a butcher block on Ms. Bell's kitchen counter that contained multiple knives.

g. Mr. Allen stated that the victim wore a white nightgown.

In fact, while a white nightgown was found on the bed and is visible in crime scene photos, Ms. Bell had told Ms. Richardson when they spoke shortly before the crime that she had just finished showering and was putting on a robe.

82.     Fourth, near the end of the recording, Mr. Allen stated that, prior to the interrogation, he had no knowledge of the details to which he confessed. In response to a question by Detective Riley as to why Mr. Allen did not recall details, the following exchange occurred:

Allen:  "I'm rememberin' it 'cause you got the evidence. I don't--"
Riley:  "I showed you--"
Allen:  "remember nothin'."
Riley:  "You mentioned the knife. You mentioned the knife. You said a knife in the kitchen."
Allen:  "Yeah, but you got the evidence and the fingerprints, you know. Before we started talkin' I said, no, I don't remember."
Riley:  "But now you do. Do you remember now?"
Allen:  "Yeah, I remember."

83.     Fifth, nearing the end of Mr. Allen alleged confession, Detective Scaggs, who

18

was present for a portion of Mr. Allen's taped interrogation, asked Mr. Allen to draw a picture of the crime scene. Detective Scaggs' goal was to test Mr. Allen's actual knowledge of the scene and to determine if his confession was credible. Mr. Allen drew a rectangle with a door and could offer nothing further. Detective Scaggs recognized immediately that the drawing revealed no actual knowledge, and, as a result, had severe doubts regarding the accuracy of the supposed confession.

84.     Overall, even the taped portion of Mr. Allen's "confession" is riddled with errors that reveal his ignorance of the crime facts and includes numerous instances where he was educated, led, and corrected to agree with Defendants' theory of Ms Bell's murder.

85.     Any reasonable officer reviewing the interrogation would have known that the confession was false and worthless. At a minimum, any reasonable officer would have continued to investigate Mr. Allen's involvement with the crime—including his alibi and the forensic evidence—and ultimately would have concluded that Mr. Allen was not involved in Ms. Bell's death.

86.     After the taped confession, Defendants arrested Mr. Allen for Ms. Bell's murder.

### FORENSIC EVIDENCE EXCLUDES MR. ALLEN

87.     Despite having arrested Mr. Allen for the crime, Defendants recognized that the evidence against him was exceedingly weak. Given Mr. Allen's clear history of mental illness, his inability to provide basic details of the crime, let alone any nonpublic information, and the lack of any reasonable explanation for how he could have gotten to Ms. Bell's apartment during the Big Snow, the confession alone was not compelling evidence. Police regarded the confession as "iffy," and the prosecutor conceded that investigators remained "cautiously suspicious."

88.     Even after having arrested Mr. Allen for the crime based on the taped confession, Defendants continued to investigate other suspects, ruling out other individuals based on their blood type and fingerprints.

89.     Defendants James, Burford, and Riley also contacted Defendants Crow and Hart in an effort to obtain forensic evidence linking Mr. Allen to the scene of Ms. Bell's murder. Their efforts failed.

90.     On March 15, 1982, the day after Defendants coerced Mr. Allen's confession, Crow collected a saliva sample from Mr. Allen. Crow used the sample to compare Mr. Allen's blood type with the two semen stains that Crow had found—one from a type A, O, or non-secretor, and one from a type B or AB individual.

91.     At this point, Defendants had already ruled out Mr. Watters and Mr. Bell as the source of the type B or AB semen, and therefore believed that this semen came from the murderer.

92.     Crow's tests revealed that Mr. Allen could not have deposited the type B or AB semen because Mr. Allen is a type O non-secretor.

93.     Defendants James, Burford, and Riley also attempted to match Mr. Allen's fingerprints to the numerous unidentified fingerprints found at Ms. Bell's apartment. Defendant Hart, the SLMPD's fingerprint examiner, tested Mr. Allen's fingerprints and confirmed that Mr. Allen was not a match for any of the useable prints lifted from Ms. Bell's apartment.

### DEFENDANTS SUPPRESS EXCULPATORY FORENSIC EVIDENCE AND FABRICATE INCULPATORY FORENSIC EVIDENCE

94.     In September of 1982, having failed to develop a lead on the real killer, Defendants decided to push forward with a prosecution against Mr. Allen. Although Defendants had all along used the type B or AB semen evidence and seven unidentified fingerprints to exclude potential suspects, they now decided to bury this exculpatory forensic evidence.

95.     First, rather than releasing Mr. Allen or even revealing this powerful exculpatory evidence to Mr. Allen's defense or the prosecution, Defendants covered up the very existence of the type B or AB semen.

20

96.     Crow doctored his Laboratory Worksheet and created a false lab report indicating that only one semen type was found at the scene—semen from a type- A, O, or non-secretor individual.[2]

97.     Crow crossed-out one section of text from the "summary" section of his Laboratory Worksheet:



98.     The scribbled text reads: "[The] seminal stains came from *two different persons one came from a type 'B' or 'AB' person. The other from an 'A', 'O' or non secretor.*" (emphasis added).

99.     Crow also struck text from a different page of the Laboratory Worksheet, which reported the ABO antigens that were discovered from testing on the victim's robes:



---

[2] Accordingly to evidence produced at trial, about 80%-90% of the population, including Mr. Allen, Mr. Watters, and Mr. Bell, are either type A, type O, or a non-secretor.

100.    The final sentence reads: "The following were also present: the 'A', [obscured], and 'H' 'ABO' antigens." The only antigens in the ABO antigen system are A, B, and H antigens, and thus the obscured text in the sentence is necessarily a reference to the "B" antigen.

101.    Critically, the "B" antigens could not have been from Ms. Bell, Mr. Bell, or Mr. Watters, suggesting that the antigens belonged to the perpetrator. Mr. Allen, as a non-secretor, could not have been the source of those antigens.

102.    Crow's typewritten report wholly withheld the B antigens findings, and showed no indication that the cross-outs were made. The summary of results contained only the following sentence:

SUMMARY OF RESULTS

All blood at the scene was the same type as the victim and approximately 36 out of 10,000 people in the general population have this type.

103.    Defendants also suppressed the Scaggs Memo—which referenced that the suspect likely had type B or AB blood—hiding it from both the defense and the prosecution.

104.    Although Defendants Riley, Wilson, Rowane, and LaGates knew that the Scaggs Memo stated that the perpetrator had type B or AB blood, they never came forward to reveal this information. Defendants Wilson, Rowane, and LaGates were involved with the investigation and had an obligation to supervise the assigned officers and investigators.

105.    Instead, the prosecution and defense were deceived by Defendants. This false serology information became powerful evidence at trial, with the State arguing in its closing argument to the jury that Mr. Allen could have left the semen found at the scene. The prosecutor argued that, had Mr. Allen been excluded as the source of the semen, "We wouldn't be here. We'd know that he couldn't have. But it's consistent."

106.    Second, Defendants hid the exculpatory fingerprints. Defendants never accurately reported or otherwise revealed, either to Mr. Allen's defense or to the prosecution, that Mr. Allen had been excluded as the source of the prints believed to have been left by the killer. Instead, Hart, in conspiracy with the other individual Defendants, falsely reported that the unidentified fingerprints were <u>unusable</u> and therefore could <u>not</u> be definitively compared against Mr. Allen (or anyone else).

107.    Third, Defendants suppressed evidence that Defendant Crow had <u>falsely</u> reported the presence of semen in a number of locations in Ms. Bell's apartment. Crow's false reports were critical because during Mr. Allen's interrogation, Defendants Riley and James had fed Mr. Allen information consistent with Crow's false findings. For example, after Crow reported the presence of semen on Ms. Bell's anal swab, on the carpet beneath her body, and on the chair in the kitchen, Riley and James fed Mr. Allen information that the perpetrator had anal sex with Ms. Bell, had intercourse with her between her bed and the wall in her bedroom, and that Ms. Bell sat on a chair in the kitchen after the sexual assault. The prosecution relied on this evidence at trial, arguing that the presence and locations of semen was critical evidence against Mr. Allen. In particular, the prosecution argued that the locations where semen was found were "consistent with what the defendant said," and therefore corroborated his confession.

108.    In fact, Crow's testing did <u>not</u> support the conclusions stated in his false laboratory report. Crow tested only for seminal acid phosphatase, an enzyme that exists in high levels in semen, but is also present in bacteria, human urine, red blood cells, cauliflower, brussel sprouts, and numerous other substances. Crow knew, as stated in the SLMPD Crime Lab manual at the time, that an acid phosphatase test is merely a <u>presumptive</u> test and requires a confirmatory

23

visualization. Crow never made the required confirmation, but nevertheless reported the presence of semen in locations that were consistent with Mr. Allen's "confession."[3]

### DEFENDANTS FABRICATE EVIDENCE
### TO CORROBORATE MR. ALLEN'S FALSE CONFESSION

109.    Defendants knew that in order to demonstrate to the prosecution, court, and jury that Mr. Allen's confession was reliable, they would have to show that Mr. Allen had provided information that only the true perpetrator would know.  This was especially important here given all the obvious reasons to question the reliability of Mr. Allen's taped confession, including Mr. Allen's mental illness, his many errors about basic facts of the crimes, and his lack of opportunity to commit the crime given the Big Snow. But Mr. Allen had not, in fact, provided any such nonpublic information. In response, Defendants conspired to fabricate evidence designed to make Mr. Allen's confession falsely appear reliable.

110.    First, Defendants unduly influenced Ms. Richardson (Ms. Bell's coworker) into corroborating the non-public "fact," stated by Mr. Allen, that while inside Ms. Bell's apartment, he heard someone say "Sherry" while banging on the front door. Riley asked Ms. Richardson whether, when she had come to Ms. Bell's door on the morning of the murder, she had called out Ms. Bell's name ("Mary"). Ms. Richardson told them that while she "may have" done so, she had no memory of doing that. Undeterred, Riley pressured Ms. Richardson for an unequivocal statement. When that did not work, Riley sent Ms. Richardson to a hypnotist to see if that could help her "remember" calling out "Mary" at the front door. Predictably, the SLMPD-organized hypnosis

---

[3] Years later, post-conviction testing has not revealed the presence of any semen on those same items (the victim's rectal swab, a cutting of carpet from between the bed and the wall, and on the kitchen chair). These new findings highlight the falsity of Mr. Allen's confession. Defendants James, Burford, and Riley coerced Mr. Allen into making statements that were consistent with what Defendants believed at the time of Mr. Allen's arrest (e.g., that Ms. Bell was anally raped, that she was raped on the floor where the body was found), but that were actually false.

session produced the false memory that Ms. Richardson had called out Mary's name. In reality, Ms. Richardson never had any memory of saying anything at the front door.

111.    Defendants never divulged, to either defense counsel or the prosecution, that Ms. Richardson had initially denied calling out Mary's name at the door, their blatant coaching and pressure on her, or their use of a hypnotist to "recover" this memory. They failed to do so for good reason: hypnotically-enhanced testimony was well known as unreliable. Indeed, two years after Mr. Allen's conviction, the Missouri Supreme Court ruled hypnotically enhanced testimony as per se inadmissible. See Alsbach v. Bader, 700 S.W.2d 823 (Mo. 1985) (en banc). "Hypnosis," the Court explained, "is by its nature a process of suggestion and one of its primary effects is that the hypnotized subject becomes extremely receptive to suggestions that he perceives as emanating from the hypnotist." Id. at 830. Relying on scientific data that predated Mr. Allen's conviction, the Court observed that "[j]ury observations may be adversely affected because the witness, after hypnosis, will have absolute subjective convictions about a set of facts, regardless of the objective accuracy of his perceptions. Equally distressing, hypnotically refreshed testimony conveys to the trier of fact a misleading aura of reliability and certainty which might cause the trier of fact to be less critical of a witness's testimony." Id. (citation omitted).

112.    Without knowing that Ms. Richardson initially had no memory of calling out Mary's name at the door, that Defendants had blatantly coached and pressured Ms. Richardson, or that Defendants had used a hypnotist to "recover" Mr. Richardson's memory, the prosecution called Ms. Richardson's testimony "the absolute crux of the lawsuit" against Mr. Allen. Ms. Richardson's unequivocal trial testimony allowed the prosecution to argue that Mr. Allen had provided the police with at least one detail that police could not possibly have fed him and that only the true perpetrator would have known. Mr. Allen's defense counsel was stripped of any basis to contest this "crux" of the prosecution's case.

113.     Second, Defendants unduly influenced Ms. Salih (Ms. Bell's neighbor) into corroborating the non-public "fact," stated by Mr. Allen, that while inside Ms. Bell's apartment, Mr. Allen heard a door open and close. For over a year, Ms. Salih repeatedly told Defendants the truth— that she did not open her door around the time of Ms. Bell's murder. In response, Defendants threatened Ms. Salih with jail and told her numerous falsehoods about Mr. Allen, including that Mr. Allen saw Ms. Salih get her mail as he was looking through Ms. Bell's peephole while holding a knife, and that Mr. Allen was in the area because he was getting a dose of methadone at a nearby hospital. Eventually, Ms. Salih yielded to Defendants' pressure and underwent two police-ordered hypnosis sessions. After these sessions, in April 1983—over <u>one year after</u> the crime—Ms. Salih falsely reported that she had opened and closed her door when she heard Ms. Richardson's knock on Ms. Bell's door. In fact, Ms. Salih never did anything of the sort. Her statement that she had was a result of Defendants' coercion.

114.     The prosecution highlighted Ms. Salih's testimony at trial, but once again, defense counsel was deprived of the critical information that Defendants had coerced Ms. Salih's testimony.

### MR. ALLEN IS WRONGFULLY CONVICTED

115.     Mr. Allen's was first tried for Ms. Bell's rape and murder on April 20–22, 1983, before Judge Koehr of the Circuit Court of the City of St. Louis. The prosecution rested on Mr. Allen's coerced confession, as well as the representations that Mr. Allen had provided nonpublic information about the crime: (1) Ms. Richardson saying "Mary" at the door; and (2) Ms. Salih opening and closing her door. Unaware of the suppressed and fabricated forensic evidence, the prosecution also argued that the forensic evidence was all consistent with Mr. Allen having committed the crime. The defense argued that Mr. Allen was innocent and had falsely confessed as a result of Defendants' pressure and leading questions. Mr. Allen's trial counsel offered the

testimony of three family members that at the time of the murder Mr. Allen was home, ten miles away, snowed in by the debilitating Big Snow.

116. After nine hours of deliberation, the trial ended in a hung jury with ten of the twelve jurors voting in favor of acquittal.

117. Mr. Allen's second trial began on July 18, 1983, before Judge Mehan. Mr. Allen's counsel again presented Mr. Allen's defense. Much like the first trial, the prosecution's primary evidence against Mr. Allen was his coerced confession, the alleged corroboration of the confession's reliability provided by Ms. Richardson and Ms. Salih, and the representation that the forensic evidence was all consistent with Mr. Allen. Once again, neither the prosecution nor the defense was aware of the suppressed exculpatory evidence, including the type B or AB semen, the fingerprints excluding Mr. Allen, the hypnosis and other pressure used on Ms. Richardson, and Defendants' other misconduct.

118. This time, on July 23, 1983, Mr. Allen was convicted of Capital Murder, Rape, Sodomy, and First Degree Burglary. On July 25, he was sentenced to 95 years in prison.

119. As a consequence of his wrongful arrest and conviction, Mr. Allen spent more than half his life incarcerated for a crime that he did not commit.

### MR. ALLEN'S EXONERATION

120. During his incarceration, Mr. Allen consistently proclaimed his innocence.

121. Mr. Allen first contacted the Innocence Project regarding post-conviction DNA testing in 1996, and his case was accepted later that year.

122. However, the Innocence Project closed Mr. Allen's case in 1997, based on information from the City that no biological evidence was available for DNA testing.

123. In August 2001, Mr. Allen filed a Petition for Writ of Habeas Corpus in the U.S. District Court for the Easter District of Missouri. By order dated February 21, 2002, the district

court dismissed Mr. Allen's petition without prejudice for failure to comply with an order directing Mr. Allen to detail the exhaustion of his state remedies.

124. In 2002, after Missouri enacted a post-conviction DNA statute, the Innocence Project was able to locate evidence that led to the exoneration of another man, Larry Johnson, even though the Innocence Project had previously received information that no evidence in his case still existed.

125. In the fall of 2002, a family advocate contacted the Innocent Project on behalf of Mr. Allen, and requested that the Innocence Project again attempt to locate evidence in Mr. Allen's case.

126. On May 7, 2003, the Innocent Project wrote to Circuit Attorney St. Louis Circuit Attorney Jennifer Joyce and requested that her office consent to DNA testing in Mr. Allen's case.

127. Circuit Attorney Joyce informed the Innocence Project that the Circuit Attorney's Justice Project was reviewing Mr. Allen's case. On May 20, Circuit Attorney Joyce agreed that Mr. Allen's case was appropriate for DNA testing.

128. On June 3, 2003, the Circuit Attorney's Office and the Innocence Project entered into a consent agreement setting forth the protocol for proceeding with post-conviction testing.

129. Testing conducted in 2003 and 2004 focused primarily on locating and identifying the source of semen in samples collected from the crime scene and from Ms. Bell during the autopsy.

130. This testing confirmed, contrary to Defendant Crow's reported findings and contrary to the evidence produced at trial, that Mr. Allen was incontrovertibly not the source of any of the semen found on the evidence and attributed to Mr. Allen at his trial.

131.    The DNA testing solely identified sperm from Mr. Watters on Ms. Bell's robe, and because Mr. Watters is neither type B or AB, it became clear that Mr. Watters could not have been the type B or AB sperm donor that was suppressed by police at the time of trial.

132.    In March 2008, attorneys with the Innocence Project and Bryan Cave LLP partnered to investigate the facts and circumstances surrounding Mr. Allen's wrongful conviction.

133.    Counsel for Mr. Allen contacted Jennifer Joyce in October 2009 and asked for additional DNA testing.

134.    In May 2010, counsel for Mr. Allen filed an uncontested motion for DNA testing along with a consent order for the DNA testing to be conducted by a private lab. This round of testing focused on searching for DNA on various items of evidence from the crime scene.

135.    In 2011, they filed a petition for a writ of habeas corpus in Cole County Circuit Court on behalf of Mr. Allen.

136.    During the course of Mr. Allen's exoneration proceedings, well over a decade after Mr. Allen first sought exculpatory DNA testing, the Circuit Attorney's Office became aware of key pieces of documentary evidence, including but not limited to the Scaggs Memorandum and fingerprint evidence, which had never previously been disclosed to either the prosecutors or defense counsel.

137.    To this point, both the Circuit Attorney's Office and Mr. Allen's counsel had relied on the fact that all relevant evidence had been disclosed by those involved in the investigation into Ms. Bell's murder.

138.    This evidence remained hidden from the Circuit Attorney's Office and Mr. Allen's counsel as a result of continuing misconduct on the part of SLMPD officers and employees.

139.   On November 2, 2012, Cole County Circuit Judge Daniel Green, in a 73-page opinion, granted the writ. Judge Green concluded that the State had violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), by withholding the following critical exculpatory evidence:

a.   Serological test results showing that foreign semen or other biological fluids—which could not have been deposited by Mr. Allen or, critically, by the victim's boyfriend or estranged husband—were found on the robe the victim was wearing at the time of the attack;

b.   Internal police documents showing that the police lab reported the exculpatory serology findings to the police investigating the case, and that police relied on these undisclosed serological results, pointing to a perpetrator with type B or AB blood, to exclude suspects until they obtained a confession from Mr. Allen;

c.   Documents showing that fingerprints found at the crime scene, which the State claimed were mere smudges unusable for comparison, were in fact usable and excluded Mr. Allen as the source, and were tested against numerous alternate suspects even after police obtained Mr. Allen's confession;

d.   A drawing of the crime scene made by Mr. Allen, which Detective Scaggs had asked Allen to draw to test his actual knowledge of the scene and to determine if his confession was credible. Detective Scaggs determined that the drawing was not consistent with the actual layout of the crime scene; and

e.   Evidence that a key State witness, Ms. Richardson, whose testimony that she yelled out the victim's name was pivotal to corroborating Mr. Allen's confession, had to be hypnotized in order to provide the certain trial testimony she offered.

140.   By feeding Mr. Allen the facts of the crime as Defendants understood them at the time of Mr. Allen's arrest, James and Riley actually caused Mr. Allen to confess to facts that are now known to be false. For example, James and Riley led Mr. Allen to confess to the anal rape of Mary Bell. At the time, based on Ms. Bell's injuries, Defendants believed she had been anally raped. Post-conviction DNA testing, however, reveals no semen or sperm was present on her rectal swab. Similarly, Defendants caused Mr. Allen to confess that he raped Ms. Bell on the floor where

her body was found because they believed that semen had been found on the carpet in that location. Yet, post-conviction testing reveals there was no semen on the carpet.

141.    Considered separately or together, Judge Green concluded that this information constitutes favorable, material evidence that the State withheld at trial in violation of its clearly delineated constitutional obligations.

142.    Mr. Allen's wrongful conviction was ultimately vacated by the Cole County Circuit Court on November 14, 2012, and he was released from custody, more than 30 years after he was arrested for a crime he did not commit. The Circuit Court's decision was affirmed by the Missouri Court of Appeals on December 26, 2012.

143.    On January 18, 2013, St. Louis Circuit Attorney Jennifer Joyce file a motion dismissing the indictment against Mr. Allen.

144.    Mr. Allen was released after spending more than thirty years in prison for a crime that he did not commit.

### PATTERN & PRACTICE OF UNCONSTITUTIONAL CONDUCT BY THE SLMPD

145.    Defendants' unconstitutional and tortious actions that led to Mr. Allen's wrongful conviction were not isolated incidents. Rather, these acts were part of a custom, policy, pattern, and practice of the SLMPD, beginning prior to Mr. Allen's arrest and continuing until at least 2012, to condone, encourage, and/or facilitate the intentional or reckless failure to investigate in a manner that shocks the conscience.

146.    This failure to investigate included the coercion of suspects and witness in order to obtain false statements, the purposeful disregard of evidence suggesting a suspect's innocence, and the suppression of exculpatory information.

147.    Defendants' actions in this case were also part of a custom, policy, pattern, and practice of the SLMPD, beginning prior to Mr. Allen's arrest and continuing until at least 2012,

to fail to adequately train, supervise, and discipline officers in critical law enforcement responsibilities.

148.    The unconstitutional pattern and practice of reckless investigation was prevalent around the time of Mr. Allen's wrongful arrest and conviction, and continued until at least 2012, resulting in a well-documented rash of wrongful convictions in St. Louis.

149.    The following numerous and contemporaneous wrongful convictions were the result of unconstitutional reckless investigations, including the coercion of defendants and witness, the purposeful disregard of evidence suggesting innocence, and the suppression of exculpatory information.

    a.  On January 2, 1983, 19-year-old James Buckley was shot and killed while working as a cashier at a gas station in the City of Dellwood, in St. Louis County. Dellwood requested the assistance of the St. Louis Major Case Squad, which included officers from the City of St. Louis and St. Louis County police departments. Ellen Maria Reasonover was wrongfully convicted of Buckley's murder and sentenced to life without the possibility of parole for fifty years. Ms. Reasonover was convicted on the false testimony of two jailhouse witnesses. Years later, counsel for Ms. Reasonover discovered the police had recorded the supposed jailhouse confessions, that the tapes disproved the false testimony offered by the jailhouse informants, and that the police had failed to turn over the tapes to Ms. Reasonover. In addition, another inmate had witnessed one of the jailhouse conversations and had come forward to tell police that Ms. Reasonover had not confessed. In response, St. Louis police threatened the witness and offered her money if she would say Reasonover confessed while in jail. The witness refused to cooperate and was hidden from the defense. Ms. Reasonover served over 16 years in prison, before the egregious misconduct came to light and Ms. Reasonover was found innocent of the crime.

    b.  On the morning of October 10, 1983, a 15-year-old girl was walking to school when she noticed a man across the street. It was 6 a.m. and still dark outside. The man attacked her as she entered the back yard of a house, threatening her with a knife. Later, while the victim was at the hospital, police showed her hundreds of photographs, including one of Anthony Woods, but she could not identify any of them. Back home and sitting on her porch, she noticed Mr. Woods walking by and identified him as her attacker. Mr. Woods lived less than two blocks away. St. Louis police inappropriately reassured the victim of her identification by falsely

32

claiming that other victims had previously identified Mr. Woods of rape, but not followed through with the case. Mr. Woods was convicted of rape, felonious restraint, and armed criminal action in 1984 and sentenced to 25 years in prison. DNA testing eventually excluded Mr. Woods and his conviction was vacated on April 21, 2005.

c.   In June 1984, 26-year-old Donald Ball was shot and killed while filling up his car at a St. Louis gas station. A month later, two witnesses came forward and identified Darryl Burton as the shooter, although Mr. Burton had no known connection to the victim. Mr. Burton was convicted of capital murder on the testimony of two men, both of whom were recruited by St. Louis police officers and manipulated into falsely implicating Mr. Burton. Another witness, Joan Williams, who had told officers that the true perpetrator was of lighter complexion, was shown a picture of Mr. Burton, told he was the shooter, and called to testify at trial. Based on this tainted testimony, Mr. Burton was sentenced to life in prison. After the conviction, Mr. Burton discovered that St. Louis police had suppressed eyewitness information about the shooter's hair and complexion, neither of which matched Mr. Burton's, and had prepared a false police report misstating the witnesses' accounts. Mr. Burton also discovered that Ms. Williams had informed officers that the shooter was much lighter complexion than Mr. Burton, but police suppressed her statements. In August 2008, 23 years after his conviction, Mr. Burton was released and the charges dismissed.

d.   In August 1984, Larry Johnson was convicted of kidnapping, robbery, rape, and sodomy and was sentenced to life plus 15 years in prison. Although the victim described her attacker as a black clean-shaven man, Mr. Johnson, who had a mustache, was brought in for a lineup. When the victim equivocally identified Mr. Johnson, a St. Louis police officer told the victim that Mr. Johnson lived near the scene of the crime and falsely stated that Mr. Johnson had raped other women who had not pressed charges. This false information reassured the victim that her identification was correct. Finally, in March 2002, after years of efforts, the Circuit Attorney's office agreed to Mr. Johnson's request for DNA testing. Results from the subsequent testing excluded Mr. Johnson from the crime. Mr. Johnson was released and exonerated on July 30, 2002, after serving 18 years in prison.

150.   The aforementioned cases exhibit a pattern and practice of reckless investigation, and are a sample of a long history of wrongful convictions obtained by the SLMPD at or around the time of Mr. Allen's wrongful conviction. Such wrongful convictions include:

a.   Ellen Maria Reasonover, arrested in 1983, exonerated in 1999.

33

    b.   George Allen, convicted in 1983, exonerated in 2012.

    c.   Larry Johnson, convicted in 1984, exonerated in 2002.

    d.   Anthony Woods, convicted in 1984, exonerated in 2005.

    e.   Darryl Burton, arrested in 1985, exonerated in 2008.

    f.   Lonnie Erby, convicted in 1986, exonerated in 2003.

    g.   Antonio Beaver, convicted in 1997, exonerated in 2007.

151.    Similar to Mr. Allen's case, where it was known throughout the SLMPD that Mr. Allen's confession was "iffy" and of limited value, upon information and belief, the official pattern and practice of unconstitutional police misconduct was open, notorious, and well-known throughout the SLMPD. As a result, St. Louis and SLMPD policymakers were aware or reasonably should have been aware of the unconstitutional pattern of reckless investigation by the SLMPD.

152.    Despite the fact that St. Louis policymakers were aware or should have been aware of this pattern of unconstitutional behavior on the part of SLMPD officers and detectives, St. Louis, the St. Louis Board, and the SLMPD, upon information and belief, did nothing to rectify the illegal investigative and interrogation practices of SLMPD officers and detectives and, thus, SLMPD officers and detectives remained free to continue to coerce witnesses and suspects and fabricate evidence.

153.    The SLMPD, and St. Louis and the St. Louis Board, by and through their final policymakers, had a custom, policy, or pattern and practice of failing to adequately train, supervise, or discipline officers concerning basic homicide investigation techniques, constitutionally adequate interrogation methods, and the obligation to disclose exculpatory and impeachment material to the prosecution.

154. The unconstitutional conduct of the SLMPD, St. Louis, and the St. Louis Board did not cease with Mr. Allen's arrest and wrongful incarceration, but continued through his habeas and exoneration proceedings.

155. In particular, the SLMPD, St. Louis, and the St. Louis Board, by and through their officials and employees, intentionally and/or recklessly and in bad faith, and in a manner that shocks the conscience, withheld and/or destroyed evidence that Mr. Allen sought to submit to DNA testing to prove his innocence, thereby delaying Mr. Allen's exoneration and depriving Mr. Allen of his liberty.

#### DEFENDANTS INTENTIONALLY INTERFERE WITH MR. ALLEN'S FAMILY RELATIONSHIP

156. Lonzetta Taylor is George Allen's mother.

157. Although Mr. Allen was an adult at the time of his wrongful arrest and incarceration, given Mr. Allen's mental illness, his relationship with his mother was functionally that of a minor child.

158. At the time of Mr. Allen's wrongful arrest, Mr. Allen lived with Ms. Taylor in University City, Missouri. Ms. Taylor was Mr. Allen's primary caretaker. Ms. Taylor would assist Mr. Allen with his day-to-day life activities. As a result, they formed a very close bond and spent much of their time together.

159. Defendants knew that Mr. Allen was Ms. Taylor's son, and they arrested Mr. Allen with the intent of depriving Ms. Taylor of her relationship with her son.

160. Defendants further knew that Mr. Allen's alibi for the time of Ms. Bell's murder relied upon his family, and in particular his mother.

161. As a result of Mr. Allen's wrongful arrest and detention, Ms. Taylor suffered deep and pervasive humiliation and harm to her affairs and reputation, and was deprived of an opportunity to associate with her son.

162.   Ms. Taylor went to nearly all of Mr. Allen's court dates and advocated for his release for decades. She frequently visited Mr. Allen in the facility where he was incarcerated, but the visits were no substitute for the life that Ms. Taylor should have shared with her son.

## MR. ALLEN'S MENTAL INCAPACITY

163.   As noted above, Mr. Allen suffers from severe mental illness, including paranoid schizophrenia.

164.   Mr. Allen's mental illness and incapacity existed at all times from Ms. Bell's murder through Mr. Allen's trial, conviction, and exoneration.

165.   In fact, his schizophrenia has worsened over time, being exacerbated by his incarceration.

166.   Mr. Allen's mental illness has prevented him from understanding or acting with discretion in many aspects of ordinary life, including but not limited to: understanding and managing his personal affairs, obtaining and maintaining gainful employment, developing and maintaining social relationships, understanding and managing his legal affairs, assisting others in the conduct of his legal affairs, and complying with deadlines.

## **DAMAGES**

167.   Defendants' actions deprived Plaintiff George Allen of his civil rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and the constitution and laws of the State of Missouri.

168.   Defendants' actions deprived Plaintiff Lonzetta Taylor of her right to familial association under the First and Fourteenth Amendments to the United States Constitution.

169.   This action seeks damages for the period from March 14, 1982, through each and every year to the present. Mr. Allen's liberty was curtailed upon his arrest and jailing on March

14, 1982. He remained incarcerated until November 14, 2012. The damages suffered by Mr. Allen and Ms. Taylor began in 1982 and continue to the present.

170.     Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Mr. Allen to be falsely arrested, unfairly tried, wrongfully convicted, and incarcerated for three decades for a crime he did not commit.

171.     Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Mr. Allen the following injuries and damages, which continue to date and will continue into the future: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; damage to business and property; legal expenses; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled monetary relief.

172.     For example, Mr. Allen lost the use of his left eye and hearing out of one ear while wrongfully incarcerated, the result of a fight with his cellmate.

173.     Mr. Allen's emotional damages during his wrongful incarceration were compounded by his mental disabilities. In particular, Mr. Allen's mental disabilities have led to extraordinary problems dealing with the anxiety and stress caused by his wrongful incarceration. These problems existed during his incarceration and continued following Mr. Allen's exoneration.

174.     Defendants' unlawful acts and omissions caused Lonzetta Taylor pecuniary and non-pecuniary damages. Most important, for thirty years, she was deprived of those benefits one would normally derive from the presence of her son, Mr. Allen. In addition, Ms. Taylor suffered

loss of consortium; loss of family relationships; loss of society; loss of the companionship and care

of her son; loss of advice, moral support, family services, attention, protection, and financial

support; pain and suffering; severe mental anguish; humiliation; degradation; and emotional distress.

Ms. Taylor also suffered from mental anguish, bereavement, and the stigma of being the mother of a

man who was arrested and incarcerated for a brutal rape and murder.

175.    Ms. Taylor also incurred significant out-of-pocket expenses throughout the

time of Mr. Allen's arrest and incarceration including, without limitation, legal expenses, visiting

expenses, and expenses for providing basic provisions to Mr. Allen while he was incarcerated.

176.    These injuries and damages to both Mr. Allen and Ms. Taylor were

foreseeable to Defendants at the time of their acts and omissions.

177.    All of the acts and omissions committed by Defendants were done

intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and

said acts meet all of the standards for imposition of punitive damages.

## FEDERAL CLAIMS

## COUNT I

### Plaintiff George Allen Jr.'s 42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law under the Fourteenth Amendment

178.    Plaintiffs hereby incorporate each of the allegations of this Complaint as if

fully set forth herein, and further allege as follows:

179.    The individual Defendants, individually and in concert, improperly coerced

Mr. Allen into falsely confessing to the rape-murder of Ms. Bell, fabricated false evidence to support

the coerced confession, suppressed exculpatory evidence that would have contradicted the false

confession, failed to investigate in a manner that shocks the conscience, and instead followed

through with the unlawful prosecution of Mr. Allen, thereby depriving Mr. Allen of his right not to

be deprived of liberty without due process of law.

180.    Defendants, individually and in concert, arrested Mr. Allen ostensibly for fitting the description of Kirk Eaton. Defendants ignored clear evidence that Mr. Allen was not Kirk Eaton and, rather than investigate likely suspects, intentionally and in bad faith set about to violate Mr. Allen's due process rights.

181.    Understanding Mr. Allen's mental state and susceptibility to false confessions, Defendants coerced Mr. Allen, through direct and indirect means, to confess to a murder that he did not commit. Defendants interrogated Mr. Allen for nearly three hours outside the presence of any friend, relative, or advisor. Defendants physically coerced Mr. Allen. Defendants utilized psychological interrogation tactics which they knew were highly likely to produce a false confession, including feeding Mr. Allen details of the crime and showing Mr. Allen photographs of the crimes scene. These techniques had the intended effect of contaminating the interrogation and producing a false confession.

182.    Defendants intentionally or recklessly ignored the inaccuracies in Mr. Allen's confession, and ignored evidence of other suspects, and instead fabricated evidence to support Mr. Allen conviction. In particular, Defendants intentionally and in bad faith coerced two witnesses— Ms. Richardson and Ms. Salih—to confirm non-public facts which Mr. Allen purportedly confessed. In fact, Defendants fed these facts to the witnesses *after* causing Mr. Allen false confession.

183.    Defendants also intentionally and in bad faith suppressed scientific evidence which they knew would clear Mr. Allen of any involvement in the crime. In particular, Defendants suppressed the existence of the unidentified type B or AB blood and suppressed the existence of the unidentified fingerprints. Prior to Mr. Allen's arrest, Defendants had relied on the blood and fingerprint evidence to rule out potential suspects. After arresting Mr. Allen, Defendants confirmed Mr. Allen did not match the blood or fingerprints and yet continued with their unconstitutional

prosecution. Defendants' actions severely prejudiced Mr. Allen at trial, violated his due process rights, and directly resulted in his wrongful conviction and incarceration.

184.    Defendants intentionally or recklessly ignored these facts and, in a manner that shocks the conscience, failed to investigate either Mr. Allen's innocence or the identity of the true perpetrator. In particular, Defendants purposefully (i) coerced and threatened Mr. Allen into a false confession; (ii) ignored evidence suggesting Mr. Allen's innocence, including the nature of Mr. Allen's confession and exculpatory body fluid and fingerprint evidence; and (iii) yielded to public pressure to solve Ms. Bell's murder by arresting an innocent man and pressuring witnesses to falsely testify. Defendants' conduct shocks the conscience and violated Mr. Allen's liberty interest in obtaining fair criminal proceedings.

185.    The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Mr. Allen's federal protected rights. These acts were perpetrated while Defendants were acting in their official capacities and under color of state law.

186.    The truth of Defendants' fabrications could not have been discovered by Mr. Allen or his attorneys through the exercise of due diligence. Defendants not only lied at trial and create false reports, but they concealed the existence of the exculpatory evidence and concealed the coercive tactics used on their witnesses.

187.    Had Defendants' fabrications and/or the material exculpatory and impeachment evidence known to them been disclosed, this evidence would have tended to prove Mr. Allen's innocence and cast doubt on the entire police investigation and prosecution.

188.    Defendants' misconduct did not cease with Mr. Allen's conviction, but continued through his exoneration, thereby prolonging his wrongful incarceration.

189.     This continuing misconduct included, without limitation, misinforming Mr. Allen regarding the availability of biological evidence for DNA testing and withholding key exculpatory documentary evidence from the Circuit Attorney's Office.

190.     Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1982 would have believed that Defendants' actions were lawful.

191.     As a direct and proximate result of Defendants' actions, Mr. Allen was wrongly prosecuted, detained, and incarcerated for more than thirty years and suffered the other grievous injuries and damages set forth above.

## COUNT II

### Plaintiff George Allen Jr.'s 42 U.S.C. § 1983 Claim for Violation of His Fifth and Fourteenth Amendment Right Against Self-Incrimination

192.     Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

193.     The individual Defendants, individually and in concert, improperly coerced Mr. Allen to falsely confess to the rape-murder of Ms. Bell, and used this coerced statement against Mr. Allen in his criminal case, thereby violating Mr. Allen's Fifth and Fourteenth Amendment protection against self-incrimination.

194.     The interrogation techniques used against Mr. Allen were unconstitutionally coercive based on the totality of the circumstances. Defendants detained Mr. Allen knowing he was not Kirk Eaton, the man they had come to suspect of this crime. Defendants had reason to know Mr. Allen was mentally ill. Nevertheless, Defendants interrogated Mr. Allen for about three hours. Defendants physically struck Mr. Allen and verbally threatened him. Defendants never left Mr. Allen alone; interrogated Mr. Allen without any friend, relative, or advisor present; falsely claimed they had strong incriminating evidence; promised leniency if Mr. Allen confessed and told Mr. Allen he would

41

be found guilty if he did not; refused to accept Mr. Allen's protestations of innocence; ignored

factual inaccuracies in Mr. Allen's statement; manipulated and misstated Mr. Allen's statements to

police; showed Mr. Allen detailed photographs of the crime scene; and ultimately obtained the

confession using leading questions that provided details about the crime.

195.    Defendants' actions were in violation of clearly established constitutional law,

and no reasonable law enforcement officer in 1982 would have believed that Defendants' actions

were lawful.

196.    As a direct and proximate result of Defendants' actions, Mr. Allen was

wrongly prosecuted, detained, and incarcerated for more than thirty years and suffered the other

grievous injuries and damages set forth above.

## COUNT III

### Plaintiff George Allen Jr.'s Claim for Violation of Title II of the Americans with Disabilities Act Against All Defendants

197.    Plaintiffs hereby incorporate each of the allegations of this Complaint as if

fully set forth herein, and further allege as follows:

198.    Plaintiff suffers from diagnosed mental illness, including schizophrenia,

which substantially limits one or more of his major life activities, including without limitation: caring

for himself, thinking, working, communicating, learning, and sleeping.

199.    The individual Defendants arrested, interrogated, and conducted an

unlawfully flawed investigation of Mr. Allen all while employed by the SLMPD, a subdivision of St.

Louis and the St. Louis Board. Arrests and investigations are services, programs, or activities of a

city's police department that are covered by the Americans with Disabilities Act.

200.    With knowledge of Mr. Allen's serious mental disabilities and/or regarding

Mr. Allen as seriously disabled, the individual Defendants discriminated against him by reason of

that disability. The City by and through its agents intentionally, or with deliberate indifference,

42

exploited Mr. Allen's mental illness by, among other things, failing to investigate his alibi and other evidence of his innocence, and conducting and relying on a flawed and coercive interrogation, and suppressing exculpatory evidence.

201.    Defendants engaged in this misconduct in whole or in part because they thought they could get away with that misconduct as a result of Mr. Allen's disabilities.

202.    Even after his conviction, Defendants continued to discriminate against Mr. Allen by reason of his disabilities by failing to come forward with evidence of their misconduct and Mr. Allen's innocence each and every year of Mr. Allen's incarceration until 2012, when Mr. Allen was exonerated. Defendants declined to come forward and identify their misconduct or Mr. Allen's innocence in whole or in part because they thought that, by virtue of Mr. Allen's mental disabilities, Defendants misconduct would not come to light.

203.    As a direct and proximate result of St. Louis, the St. Louis Board, the SLMPD, and the individual Defendants' actions, Mr. Allen was wrongly prosecuted, detained, and incarcerated for more than thirty years and suffered the other grievous injuries and damages set forth above.

## COUNT IV

### Plaintiff George Allen Jr.'s Claim under 29 U.S.C. § 794, Section 504 of the Rehabilitation Act of 1973 Against All Defendants

204.    Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

205.    By virtue of his diagnosed mental illness, Mr. Allen was disabled and was a qualified individual as defined by the Rehabilitation Act.

206.    St. Louis is an entity receiving federal funds as defined by the Rehabilitation Act.

207.    With knowledge of Mr. Allen's serious mental disabilities and/or regarding Mr. Allen as seriously disabled, the individual Defendants discriminated against him by reason of that disability. The City by and through its agents intentionally, or with deliberate indifference, exploited Mr. Allen's mental illness by, among other things, failing to investigate his alibi and other evidence of his innocence, and conducting and relying on a flawed and coercive interrogation, and suppressing exculpatory evidence. Defendants engaged in this misconduct in whole or in part because they thought they could get away with that misconduct as a result of Mr. Allen's disabilities.

208.    St. Louis, the St. Louis Board, and the SLMPD, through the individual Defendants, also failed to accommodate and, rather, exploited Mr. Allen's disability when they coerced his confession, fed him facts about the crime and falsely attributed them to him, and exploited his mental illness in order to obtain a confession and conviction.

209.    St. Louis, the St. Louis Board, and the SLMPD discriminated against Mr. Allen by failing to accommodate his mental disability by failing to regulate, train, discipline, and otherwise supervise its employees to properly accommodate the disabilities of mentally ill suspects in conducting interrogations and other law enforcement activities.

210.    Even after his conviction, Defendants continued to discriminate against Mr. Allen by reason of his disabilities by failing to come forward with evidence of their misconduct and Mr. Allen's innocence each and every year of Mr. Allen's incarceration until 2012, when Mr. Allen was exonerated. Defendants declined to come forward and identify their misconduct or Mr. Allen's innocence in whole or in part because they thought that, by virtue of Mr. Allen's mental disabilities, Defendants misconduct would not come to light.

211.    As a direct and proximate result of the actions of St. Louis, the St. Louis Board, the SLMPD, and the individual Defendants, Mr. Allen was wrongly prosecuted, detained,

and incarcerated for more than thirty years and suffered the other grievous injuries and damages set forth above.

## COUNT V

**Plaintiff George Allen Jr.'s 42 U.S.C. § 1983 Claim for First and Fourteenth Amendment Violations of Rights of Access to Courts and Executive Clemency**

212.     Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

213.     Having secured Mr. Allen's wrongful incarceration through a false confession, fabrication of evidence, and suppression of exculpatory evidence, the individual Defendants had a clearly-established affirmative obligation to come forward with the truth during each year that Mr. Allen was wrongfully detained.

214.     Instead, Defendants intentionally, or with reckless indifference, did not disclose their misconduct and Mr. Allen's innocence, continuing to suppress the truth up until Mr. Allen's exoneration in 2012.

215.     Defendants' actions directly caused the false imprisonment of Mr. Allen and the repeated denial of his post-conviction requests for release, as well as numerous other physical and bodily injuries as set forth above.

## COUNT VI

**Plaintiff George Allen Jr.'s 42 U.S.C. § 1983 Supervisory Liability Against Defendants Wilson, Rowane, and Gates**

216.     Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

217.     Mr. Allen's wrongful arrest, confinement, prosecution, trial, conviction, and incarceration was caused by the unconstitutional action and inaction of Wilson, Rowane, and LaGates, acting in their individual capacities and under color of law.

218.     Upon information and belief, Wilson, Rowane, and LaGates directly participated in the misconduct that resulted in Mr. Allen's wrongful conviction, including but not limited to fabricating evidence, suppressing exculpatory evidence, and coercing, fabricating, or suggesting false identifications and suppressing exculpatory evidence.

219.     Wilson, Rowane, and LaGates knowingly refused to terminate the wrongful prosecution of Mr. Allen, which, upon information and belief, they knew or should have known had been initiated based on the coerced and fabricated evidence, and in spite of suppressed exculpatory information.  As a result Wilson, Rowane, and LaGates knew or reasonably should have known that Mr. Allen's constitutional rights to be free from unreasonable seizure and not to be deprived of liberty without due process of law would be violated.

220.     Wilson, Rowane, and LaGates culpably failed to adequately train, supervise, an/or control their subordinates, including Crow, James, Burford, Riley, and Hart, who obtained coerced and fabricated evidence, and suppressed exculpatory information.

221.     Wilson, Rowane, and LaGates violated Mr. Allen's constitutional rights by acquiescing in the deprivation of Allen's constitutional rights by their subordinates, and by generally showing a reckless or callous indifference to Allen's rights.

222.     Wilson, Rowane, and LaGates's failure to train, supervise, and/or control their subordinates, their indifference to the actions of their subordinates, and their indifference to Mr. Allen's rights, encouraged and permitted their subordinates to fabricate evidence and to fail to document and to disclose exculpatory evidence.

223.     The actions and omissions of Defendants Wilson, Rowane, and LaGates, in their individual capacities, caused Mr. Allen to suffer the constitutional deprivations and grievous personal injuries and damages described above.

## COUNT VII

### Plaintiff George Allen Jr.'s 42 U.S.C. § 1983 Civil Rights Conspiracy Claim

224.    Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

225.    The individual Defendants and others yet unknown agreed among themselves and others to act in concert to deprive Mr. Allen of his clearly established constitutional rights as protected by the Fifth and Fourteenth Amendments, including his right not to be deprived of liberty without due process of law and his right against self-incrimination.

226.    In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including but not limited to the following:

  a.   Acting in concert to arrest and interrogate Mr. Allen although he demonstrated he was not Kirk Eaton;

  b.   Acting in concert to coerce Mr. Allen into falsely confessing;

  c.   Acting in concert to fabricate witness and forensic evidence to bolster Mr. Allen's false confession;

  d.   Acting in concert to suppress evidence demonstrating Mr. Allen's innocence;

  e.   Prior and subsequent to Mr. Allen's arrest, charging, and indictment, deliberately ignoring and/or recklessly failing to investigate leads pointing to other suspects and corroborating Mr. Allen's innocence.

227.    As a direct and proximate result of Defendants' overt acts, Mr. Allen was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for more than thirty years; and subjected to other grievous injuries and damages as set forth above.

## COUNT VIII

**Plaintiff Lonzetta Taylor's 42 U.S.C. § 1983 Claim for Violation of the Right to Familial Association Pursuant to the First and Fourteenth Amendments**

228.　Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

229.　The individual Defendants knew that Plaintiff Lonzetta Taylor was Plaintiff George Allen Jr.'s mother. The individual Defendants also knew or should have known that Ms. Taylor was Mr. Allen's primary caretaker, and that as a result, the two were extraordinarily close.

230.　By wrongfully arresting Ms. Taylor's son and causing his wrongful incarceration, knowing or having reason to know that he had nothing to do with the crime, Defendants intentionally deprived Ms. Taylor of her right of familial association with her son. As a result of Defendants' unlawful and intentional actions, Mr. Allen spent more than thirty years in prison and his mother was effectively denied a relationship with her son during those years.

231.　Because Defendants violated their ongoing affirmative obligation to come forward with the evidence of Mr. Allen's innocence and the truth of their own misconduct, Defendants denied Ms. Taylor the opportunity to reunite with her son.

232.　Defendants, through their misconduct against Mr. Allen, deliberately violated Ms. Taylor's clearly established First and Fourteenth Amendment rights to be free from unwarranted government interference with her familial relationship to Mr. Allen without due process of law.

233.　Defendants' actions were in violation of clearly established constitutional law, and no reasonable law enforcement officer in 1982 or at any subsequent point would have believed that Defendants' actions were lawful.

234.　As a direct and proximate result of Defendants' actions, Ms. Taylor suffered the grievous and continuing injuries and damages as set forth above.

48

<u>Count IX</u>

**Plaintiff George Allen Jr.'s 42 U.S.C. § 1983 *Monell* Claim for Deprivation of Liberty Without Due Process of Law under the Fourteenth Amendment**

235.    Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

236.    St. Louis and the St. Louis Board were at all times relevant to this Complaint responsible for the policies, practices, and customs of the SLMPD.

237.    The misconduct described above by the individual Defendants was undertaken pursuant to policies, practices and/or customs of St. Louis, the St. Louis Board, and the SLMPD, which included but were by no means limited to:

> a.    arresting, investigating, and prosecuting individuals that were innocent of the crime charged through profoundly flawed investigations;
>
> b.    obtaining coerced confessions to support false prosecutions;
>
> c.    fabricating evidence, including but not limited to witness statements, to bolster coerced confessions and false prosecutions;
>
> d.    failing to document and disclose material, exculpatory, and impeachment evidence to prosecutors, defense counsel, and the court;
>
> e.    failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations; and
>
> f.    engaging in the affirmative concealment and cover up of this type of misconduct from the time of Mr. Allen's arrest through his exoneration.

238.    Prior to and at the time of the unlawful investigation, prosecution, and incarceration of Mr. Allen, and continuing through to at least 2012, St. Louis, the St. Louis Board, and the SLMPD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of failing to supervise and train its officers with respect to fundamental investigative techniques and duties, including techniques with respect to proper interrogations, duty to avoid coaching witnesses, the duty to disclose manipulation of witness recollections and exculpatory

evidence to prosecutors and defense counsel, proper methods of securing and testing evidence, and proper methods of locating suspects and following up on leads.

239.    Prior to and at the time of the unlawful investigation, prosecution, and incarceration of Mr. Allen, and continuing through to at least 2012, St. Louis, the St. Louis Board, and the SLMPD, by and through their final policymakers, also maintained a policy, custom, or pattern and practice of failing to supervise and discipline corruption, including intentional misconduct by committed by officers in the course of criminal investigations.

240.    The above-described widespread practices, which were so well-settled as to constitute de facto policy in the SLMPD, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the likelihood that wrongful incarceration would result from them.

241.    This deliberate indifference resulted in the numerous wrongful convictions and exonerations detailed in this Complaint.

242.    St. Louis, the St. Louis Board, and the SLMPD's policies, customs, and patterns and practices were a moving force behind the denial of due process to George Allen in that they directly caused police improprieties and errors in the investigation, including conducting unduly coercive interrogation procedures, manipulating witnesses recollections so as to bolster the false confession obtained, failing to follow up on exculpatory investigative leads and evidence, and failing to report exculpatory material to prosecutors and defense counsel.

243.    The unconstitutional policies, customs, patterns, and practices of St. Louis, the St. Louis Board, and the SLMPD also delayed Mr. Allen's exoneration, contributing to the continued suppression of exculpatory biological and documentary evidence from the time that Mr. Allen first sought DNA testing and continuing through his ultimate exoneration.

244.     The misconduct and constitutional violations committed by the individual Defendants in the course of the investigation and prosecution of Mr. Allen, and continuing through his exoneration, were carried out pursuant to these policies, customs, or patterns and practices of investigative misconduct, and were directly and proximately caused by the SLMPD's failure to train, supervise, and discipline investigators.

245.     As a direct and proximate result of St. Louis, the St. Louis Board, and the SLMPD's policies, customs, or patterns and practices, Mr. Allen was wrongly prosecuted, and continually detained for more than thirty years and suffered the other grievous and continuing injuries and damages as set forth above.

## MISSOURI STATE LAW CLAIMS

## COUNT X

### Plaintiff George Allen Jr.'s Missouri State Law Claim for False Arrest

246.     Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

247.     Defendants, acting separately and in concert, individually and in their official capacities, did willfully, unlawfully, maliciously, and without probable cause or legal justification, cause Mr. Allen to be confined for the rape-murder of Ms. Bell.

248.     Defendants first stopped Mr. Allen without legal justification, but under the guise that he fit Kirk Eaton's description. Mr. Allen produced documentation establishing that he was not Kirk Eaton. Defendants therefore knew, or had reason to know, that Mr. Allen was not Kirk Eaton, but nonetheless arrested, detained, and interrogated Mr. Allen.

249.     Defendants engaged in this course of conduct without concern for or consideration of Mr. Allen's perceived guilt or innocence, and for no purpose related to any legitimate prosecutorial concerns.

250.     As a direct and proximate result of Mr. Allen's false arrest, he was wrongfully detained and incarcerated and served more than thirty years for crimes he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described above.

## COUNT XI

### Plaintiff George Allen Jr.'s Missouri State Law Claim for Malicious Prosecution

251.     Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

252.     Defendants, acting separately and in concert, individually and in their official capacities, did willfully, unlawfully, maliciously and without probable cause or legal justification, cause Mr. Allen to be prosecuted, detained, and incarcerated for the rape-murder of Ms. Bell.

253.     Based on Mr. Allen's lack of knowledge of the crime and ample exculpatory forensic evidence, Defendants knew, or should have known, that Mr. Allen was innocent. Nevertheless, without probable cause, Defendants caused the commencement of prosecution proceedings against Mr. Allen. Defendants' conduct was actuated without any proper motive and with malice because Defendants knew that Mr. Allen was not the actual perpetrator of the crime.

254.     Thirty years after Defendants maliciously caused the commencement of a false prosecution against Mr. Allen, the proceedings were terminated in Mr. Allen's favor through his exoneration on November 2, 2012. Judge Daniel Green granted a writ of habeas corpus on the grounds that the State withheld material exculpatory evidence contrary to the holding of Brady v. Maryland, 373 U.S. 83 (1963), and the suppression of such evidence prejudiced Mr. Allen. Mr. Allen was released from prison on November 14, 2012, more than 30 years after he was arrested for a crime he did not commit.

255.     As a direct and proximate result of Defendants' malicious prosecution of Mr. Allen, Mr. Allen was wrongfully detained and incarcerated and served more than thirty years for

crimes he did not commit, and suffered the physical, emotional, and pecuniary damages as described above.

## COUNT XII

### Plaintiff George Allen Jr.'s Missouri State Law Claim for Abuse of Process

256.    Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

257.    Defendants, acting separately and in concert, individually and in their official capacities, made an illegal, improper, perverted use of process, namely the arrest, investigation, and prosecution of Mr. Allen for a crime that he did not commit.

258.    Defendants knew that the use of such process was neither warranted nor authorized because they knew, or had reason to know, that Mr. Allen was innocent.

259.    As a direct and proximate result of Defendants' abuse of process, Mr. Allen was wrongfully detained and incarcerated and served more than thirty years for crimes he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described above.

## COUNT XIII

### Plaintiff George Allen Jr.'s Missouri State Law Claim for
### Intentional Infliction of Emotional Distress

260.    Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

261.    Defendants, acting separately and in concert, individually and in their official capacities, did intentionally, maliciously, and with reckless disregard and deliberate indifference to Mr. Allen's rights, engage in extreme and outrageous conduct in connection with the unlawful arrest, interrogation, and prosecution of Mr. Allen, including without limitation, coercing his confession, failing to investigate, fabricating evidence, presenting false testimony, and suppressing exculpatory evidence.

262.     Defendants, knowing that Mr. Allen was innocent of the crime and knowing that Mr. Allen was mentally ill, acted only to cause him extreme emotional distress, and in fact did cause Mr. Allen severe emotion distress that resulted in bodily harm.

263.     Defendants conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

264.     As a direct and proximate result of Defendants' joint and several extreme and outrageous behavior, Mr. Allen was wrongfully detained and incarcerated and served more than thirty years, and suffered severe emotional distress for which he is entitled to damages.

## COUNT XIV

### Plaintiff George Allen Jr.'s Missouri State Law Claim for
### Negligent Infliction of Emotional Distress

265.     Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

266.     Defendants, acting separately and in concert, individually and in their official capacities, realized or should have realized that their conduct involved an unreasonable risk of causing distress to Mr. Allen.

267.     As a direct and proximate result of Defendants' joint and several unreasonable behavior, Mr. Allen suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant, for which he is entitled to damages.

## COUNT XV

### Plaintiff George Allen Jr.'s Missouri State Law Claim for Civil Conspiracy

268.     Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

269.     Defendants and others yet unknown agreed among themselves and others to act in concert with the unlawful objective of depriving Mr. Allen of his constitutional rights as protected by the U.S. and Missouri constitutions, including his right not to be deprived of liberty without due process of law and his right against self-incrimination.

270.     In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including but not limited to the following:

  a.   Acting in concert to arrest and interrogate Mr. Allen although he demonstrated he was not Kirk Eaton;

  b.   Acting in concert to coerce Mr. Allen into falsely confessing;

  c.   Acting in concert to fabricate witness and forensic evidence to bolster Mr. Allen's false confession;

  d.   Acting in concert to suppress evidence demonstrating Mr. Allen's innocence;

  e.   Prior and subsequent to Mr. Allen's arrest, charging, and indictment, deliberately ignoring and/or recklessly failing to investigate leads pointing to other suspects and corroborating Mr. Allen's innocence.

271.     As a direct and proximate result of Defendants' overt acts, Mr. Allen was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for more than thirty years; and subjected to other grievous injuries and damages as set forth above.

## COUNT XVI

### Plaintiff George Allen Jr.'s Missouri State Law Claim for Respondeat Superior

272.     Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

273.     Defendants were, at all relevant times, employed by the City of St. Louis and the SLMPD, and were either members, officers, directors, or commissioners of the City, the SLMPD, and or the Board.

274.     Defendants were, at all times, acting within the course and scope of their employment with the City of St. Louis and the SLMPD in that their action were in furtherance of the investigation of Ms. Bell's murder, which was the assigned responsibility of each of the individual Defendants.

275.     Accordingly, Defendants St. Louis, the St. Louis Board, and the members of the St. Louis Board are liable as principals for all torts committed by their agents and employees.

**WHEREFORE**, Plaintiffs George Allen, Jr. and Lonzetta Taylor respectfully request:

a.     A trial by jury for each of the Plaintiffs;

b.     That the Court award compensatory damages to Plaintiffs and against Defendants, jointly and severally, in an amount to be determined at trial;

c.     That the Court award punitive damages to Plaintiffs and against Defendants, in an amount to be determined at trial, in order to deter such conduct by Defendants in the future;

d.     For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims, the Americans with Disabilities Act, the Rehabilitation Act, and Missouri state law; and

e.     For any and all other relief to which they may be entitled.

Respectfully submitted,

BRYAN CAVE LLP

By_____

      Charles A. Weiss, MO #20299
      Ameer Gado, MO #53363
      One Metropolitan Square
      211 North Broadway, Suite 3600
      St. Louis, MO 63102
      (314) 259-2000
      (314) 259-2020 [FAX]
      caweiss@bryancave.com
      aagado@bryancave.com


Barry Scheck
Nick Brustin
Anna Benvenutti Hoffmann
Farhang Heydari
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
(212) 965-9081
*Attorneys awaiting permission to appear*
pro hac vice

ATTORNEYS FOR PLAINTIFFS