**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GEORGE ALLEN JR. and LONZETTA TAYLOR, | ) ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:14-cv-01398 RWS |
| v. | ) | |
| | ) | |
| THE CITY OF ST. LOUIS, MISSOURI, et al., | ) ) | |
| Defendants. | ) | |

<u>**PLAINTIFFS' MOTION TO DISQUALIFY COUNSEL**</u>

**I.      Introduction**

Plaintiffs bring this motion to disqualify the Missouri Attorney General's Office from representing any defendant in this action. The Attorney General's Office has, since this lawsuit began, represented various individual police officers and lab analyst defendants involved in the criminal investigation that led to Plaintiff George Allen's 31 years of wrongful imprisonment. At the same time, the Attorney General's Office has been representing the State of Missouri (the "State") in state-court proceedings concerning indemnification in this case, and the St. Louis City Board of Police Commissioners (the "Board"), who also are defendants in this action. As discussed below, these various defendants have interests that are directly adverse to one another in myriad ways, creating clear conflicts of interest for the Attorney General's Office.

Had the State agreed to indemnify the individual defendants, and had the Attorney General's Office fully disclosed all conflicts of interest and obtained waivers from each client at the outset of the litigation—in other words, complied with the clear ethical rules that dictate when counsel may and may not represent multiple defendants with different interests—it might

1

have been permissible for the same office to represent the State, the Board, and the individual defendants. Instead, as explained below, the Attorney General's Office appears to have misinformed the individual defendants that they would be indemnified, or, at a minimum, knowingly allowed them to testify under that misunderstanding, while simultaneously filing motions to avoid indemnification and prevent Plaintiffs from pursuing claims against the deceased detective who took George Allen's false confession. In other words, the Attorney General's Office has aggressively litigated to benefit one of its clients, the State, to the detriment of its other clients, the individual defendants, without fully disclosing the conflicts to the individual defendants, as the ethical rules require.

Plaintiffs first became aware of the conflicts described in this motion in the days following the first two depositions in this case, which took place on April 14 and 15, 2016. On those dates, Defendants Terry James and Mark Burford each testified that he understood he would be fully indemnified in this case by either the City of St. Louis (the "City") or State. Both Defendants were represented at those depositions by the same counsel from the Attorney General's Office, who did not stop the deposition or correct either defendant's testimony in any way. Two business days later, Plaintiff's counsel discovered from public sources that despite the testimony its clients had just given, the Attorney General's Office had filed a declaratory judgment action in state court seeking a ruling that the Missouri State Legal Expense Fund ("LEF") cannot be used to pay any judgment or settlement in this case—essentially asking the state court to cut off a potential source of indemnification for James and Burford. Plaintiffs subsequently confirmed with both the State and the City that neither entity has committed to indemnifying the individual defendants, despite apparent promises to the contrary and Defendants James's and Burford's reliance on those promises.

This is merely the starkest example of the ways in which the multiple clients represented by the Attorney General's Counsel have interests adverse to one another; the individual defendants also have potential complete defenses based on *Monell* liability, as well as cross-claims against one another, none of which have been pursued thus far. And now, based on apparent promises made and the conflicted representation of the Attorney General's Office, the individual defendants also have indemnification claims against the State based on an estoppel theory, and against their attorneys based on a malpractice theory, for which their current counsel would be key witnesses.

Absent an agreement to indemnify, the only way to cure these conflicts consistent with the Rules of Professional Conduct is through disqualification of the Attorney General's Office from this case. The individual defendants each require separate, conflict-free counsel for several reasons: to evaluate and potentially pursue claims of indemnification or estoppel against the state; to assert their interests, independent from those of the Board, in the context of a *Monell* claim (and vice versa for the Board); to pursue potential cross-claims and defenses against other defendants; and potentially to pursue malpractice claims against their attorneys in the event the defendants are held personally liable.

Plaintiffs understand that motions to disqualify are generally disfavored and do not take this action lightly. Nor do Plaintiffs assert that counsel at the Attorney General's Office intentionally violated ethics rules. But concurrent representation of defendants with adverse interests threatens the integrity of the proceedings, and could undermine a successful verdict in favor of Plaintiffs. *See, e.g.*, *Dunton v County of Suffolk*, 729 F.2d 903 (2d Cir. 1984), amended in part on other grounds, 748 F. 2d 69 (2d Cir. 1984) (reversing plaintiffs' verdict against police

officer in a civil rights case where same attorneys represented the officer and municipality).
Plaintiffs thus have no choice but to ask the Court to intervene.

## II.     Background

In August 2014, Plaintiffs George Allen and his mother, Lonzetta Taylor, brought this civil action seeking redress for Mr. Allen's 31 years of wrongful imprisonment. Plaintiffs brought claims against various individual defendants, including Terry James and Mark Burford—the St. Louis Metropolitan Police Department ("SLMPD") officers who arrested Mr. Allen and were involved in questioning him; Herbert Riley, the lead Homicide detective who, along with James, interrogated Mr. Allen and took the false confession used to wrongfully convict him; Joseph Crow, the SLMPD criminalist who failed to disclose that his serological testing excluded Mr. Allen as the source of the semen on the victim's robe; Gerald Hart, the fingerprint examiner who suppressed the fact that Mr. Allen was excluded as the source of the prints recovered at the scene; and William Wilson, Thomas Rowane, and Aloy LaGates, who supervised the investigation. (*See* Dkt. No. 1 (Complaint); Decl. of Nick Brustin ("Brustin Decl.") ¶¶ 5–6).

In addition, Plaintiffs brought *Monell* claims against the City and the five members of the Board, for the policies and practices of the SLMPD, both within the Homicide Division and at the Crime Lab, that were the moving force behind the violations that caused Mr. Allen's wrongful prosecution and conviction. (*See* Dkt. No. 1; Brustin Decl. ¶ 6).

The Board and all of the individual defendants living at the time the Complaint was filed (the "non-City Defendants") are represented by Robert Isaacson of the Missouri Attorney General's Office. Mr. Isaacson has represented all of the living individual defendants throughout

this litigation, including in conjunction with discovery responses and the depositions that have been taken to date—of Terry James and Mark Burford. (Brustin Decl. ¶¶ 8, 21–23, 26).

Three of the individual defendants—Riley, Hart, and LaGates—were deceased when Plaintiffs file the Complaint. Plaintiffs moved to appoint defendants *ad litem* and substitute parties for these deceased defendants, but the non-City defendants successfully argued that the Court should deny Plaintiffs' motion on the basis that the LEF does not qualify as insurance for the purposes of MO. REV. STAT. § 537.021.1(2), which allows the appointment of a defendant *ad litem* if the deceased wrongdoer was insured against liability. (Brustin Decl. ¶¶ 14–18).

Plaintiffs served requests for production, interrogatories, and requests for admission on the City, the Board, and the living individual defendants in July 2015, and received responses from each of the defendants that were largely similar—and in some cases identical—both in terms of their objections and their substantive content. (*Id.* at ¶¶ 19–23).

On April 14 and 15, 2016, Plaintiffs deposed Defendants Terry James and Mark Burford. Both defendants were represented at their depositions by Mr. Isaacson of the Attorney General's Office. (*Id.* at ¶¶ 24, 26, 36). Representatives of the City chose not to appear. (*Id.* at ¶ 25). At the outset of Defendant James's deposition, he testified that he understood he was an individual defendant in this civil case, which, if successful, could result in a judgment against him for millions of dollars. (*Id.* at ¶ 27). Counsel for Plaintiffs then asked several pointed questions about whether James was being indemnified. James repeatedly confirmed that he understood that, in the event of a judgment against him, either the City, the State, or both would pay for all expenses and all damages. (*Id.* at ¶¶ 28–30). Mr. Isaacson—who represented James at the deposition— made no attempt to stop the deposition, correct any mistakes in the record, or confer with his client after his responses to questioning about indemnification. James was permitted to testify for

a full day under the impression that he would be indemnified for any judgment against him. (*Id.* at ¶¶ 31–33). The following day Mark Burford, who, like James, was represented by Mr. Isaacson, testified that he too understood that if he were to be found liable, either the City or the State would cover his damages. (*See id.* at ¶¶ 36–37). No attempt was made to correct his understanding or the record.

Neither James nor Burford sat in on one another's depositions. Both James and Burford testified that they had reviewed only their testimony from the criminal proceedings, and not the testimony of any other defendant. Nor did they review any relevant *Monell* evidence, such as policies or practices of the SLMPD, that could provide the basis for a potential defense that their conduct was in accordance with official practice. (*Id.* at ¶¶ 34–35, 38–39).

Three days later, Plaintiffs' counsel learned that while Burford's deposition was taking place, the Attorney General's Office had filed a separate declaratory judgment action in the Circuit Court of the City of St. Louis seeking an adjudication of the "rights and responsibilities of [the State and the City of St. Louis] with regard to whether the LEF or the City of St. Louis must pay potential judgment or settlement . . . on behalf of the Police Defendants." (*Id.* at ¶¶ 40, 42). The action names the State of Missouri as the plaintiff, and names as defendants the City; George Allen and Lonzetta Taylor; and several of the clients that the Attorney General's Office was actively representing in the *Allen* matter: the Board, the SLMPD Chief of Police, and the living individual defendants (James, Burford, Crow, and Wilson). (*Id.* at ¶ 41).

In that declaratory action the State contends that "the City of St. Louis is responsible for any judgment or settlement in the Allen Federal Case, including any portion borne by the Police Defendants." (*Id.* at ¶ 44). In contradiction to Defendants James's and Burford's deposition testimony, the State further alleges that:

> While the Attorney General's Office is providing legal representation to the Police Defendants, at no time did the Attorney General's Office or any other State office or official advise the Police Defendants or the City of St. Louis that the LEF would be responsible for any judgment against the Police Defendants.

(*Id.* at ¶ 43). The declaratory judgment petition did not indicate that, in the event the State lost the declaratory judgment, the State would be liable for the full amount of the judgment whether or not it exceeded the damages caps in the State LEF.

Plaintiffs' counsel learned of this action through public sources on April 19, two business days after Burford's deposition, and immediately contacted Mr. Isaacson to discuss the apparent contradiction between the State's position and the sworn testimony of Defendants James and Burford. (*Id.* at ¶¶ 45–46). Plaintiffs' counsel subsequently contacted senior attorneys at the Attorney General's Office and the St. Louis City Counselor's Office to determine the State's and the City's respective positions regarding indemnification of the individual defendants. (*Id.* at ¶ 47).

During these conversations and in subsequent email correspondence, the State took the position that it will only indemnify the individual defendants up to $1,000,000, and no more, *if* the declaratory action is decided against the State. If on the other hand the State succeeds in the declaratory action, it will not indemnify the individual defendants at all. The City likewise made no commitment to indemnify the individual defendants, and took the position that it has no duty to indemnify any of the individual defendant officers under any circumstances. (*Id.* at ¶¶ 48–53).

Plaintiffs' counsel raised this issue with this Court on April 29, 2016, and were permitted to file a motion to disqualify. (Dkt. No. 76).

## III. Legal Standards

"Because of the potential for abuse by opposing counsel, disqualification motions should be subjected to particularly strict judicial scrutiny." *Harker v. C.I.R.*, 82 F.3d 806, 808 (8th Cir.

1996) (internal quotation marks omitted). However, "because courts also have the duty to maintain public confidence in the legal profession and to ensure the integrity of judicial proceedings, any legitimate doubts must be resolved in favor of disqualification." *Process Controls Intern, Inc. v. Emerson Process Mgmt.*, No. 10-CV-645, 2011 WL 1791714, at *4 (E.D. Mo. May 10, 2011); *Coffelt v. Shell*, 577 F.2d 30, 32 (8th Cir. 1978) ("[I]n the disqualification situation, any doubt is to be resolved in favor of disqualification"). Where "interests [are] so adverse and conflicting . . . that there could not properly be any dual representation even *with* and after full and complete disclosure and consent . . . the court has inherent power to, and should, intervene to prevent it." *Acorn Printing Co. v. Brown*, 385 S.W.2d 812, 817–18 (Mo. Ct. App. 1964).

      The Eastern District of Missouri has adopted the Rules of Professional Conduct of the Supreme Court of Missouri. Rule 4-1.7 of the Missouri Rules of Professional Conduct ("Rule 1.7"), which is identical to the ABA Model Rule of Professional Conduct 1.7, provides:

> (a) Except as provided in Rule 4-1.7(b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>> (1) the representation of one client will be directly adverse to another client; or
>> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.
>
> (b) Notwithstanding the existence of a concurrent conflict of interest under Rule 4-1.7(a), a lawyer may represent a client if:
>> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>> (2) the representation is not prohibited by law;
>> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
>> (4) each affected client gives informed consent, confirmed in writing.

**IV.** **Absent Indemnification, the Attorney General's Office must be disqualified for conflicts of interest involving concurrent representation of the State of Missouri, the St. Louis City Board of Police Commissioners, and the individual defendants.**

Unless the State agrees to indemnify their individual-defendant clients, the Attorney General's Office must be disqualified from representing those individuals—and any other defendant, including the State and the Board—due to several actual and unwaiveable conflicts of interest under the applicable Rule of Professional Conduct governing concurrent representation. Specifically, counsel may not represent the individual defendants in this action—where they could face personal liability—while concurrently representing the State of Missouri in a declaratory judgment action that would eliminate the individual defendants' access to a source of funding in the event they are held personally liable. Nor can counsel represent the individual defendants given the individual defendants' potential claims for indemnification against the State, in which their counsel would necessarily be important witnesses. And counsel may not concurrently represent the individual defendants while representing the Board against *Monell* claims, when the interests and defenses of individual and governmental-entity clients with respect to such claims are directly adverse to one another. Finally, counsel may not concurrently represent the various individual clients concurrently, when they likely have cross-claims and defenses that implicate one other. These conflicts are of a type that cannot be cured through disclosure and consent, generally, and certainly not at this stage in the litigation.

**A.** **Concurrent representation of the State, the Board, and the individual defendants is impermissible where, as here, the State declines to indemnify the individual defendants, and takes positions that are against their interests.**

With limited exceptions, Rule 4-1.7 prohibits representation involving a concurrent conflict of interest, which the Rule defines as existing where "the representation of one client will be directly adverse to another client," or where "there is a significant risk that the representation . . . will be materially limited by the lawyer's responsibilities to another client."

Rule 1.7(a)(1)–(2). Thus, "[a]n attorney has an ethical obligation to his or her client that does not admit of competing allegiances." *S. Council of Indus. Workers v. Ford*, 83 F.3d 966, 968 (8th Cir. 1996) (citations omitted) (attorney representing client in a personal injury action against supermarket could not be a fiduciary to an employee benefit fund that paid his client's medical costs and was seeking reimbursement from supermarket's insurer, because it would subject him to "unacceptable conflicts of interest."); *see also Hamilton v. City of Hayti*, No. 14-CV-109, 2014 WL 7157329, at *3 (E.D. Mo. Dec. 15, 2014) (disqualifying attorney from representing plaintiff in a civil rights action against city officials where attorney also represented city's mayor in separate criminal action).

Although "the existence of an indemnification agreement, and resulting coincident financial interests, substantially reduces . . . the possibility of conflict of interest," *see Miller v. Alagna*, 138 F. Supp. 2d 1252, 1256–58 (C.D. Cal. 2000) (citations and internal quotations omitted), where a governmental entity has not agreed to indemnify its officers, there is a clear disqualifying conflict of interest that prevents concurrent representation of the entity and its officers. *See Matter of Petition for Review of Op. 552 of Advisory Comm. on Prof'l Ethics*, 507 A.2d 233, 236–38 (N.J. 1986) (noting that, "in the case of an actual conflict in a § 1983 action involving multiple representation (for example, where a governmental body refuses to indemnify its co-defendant officials or employees) consent of the parties to joint representation will not satisfy the requirements of *RPC* 1.7").

The situation here is analogous to the relationship between an insurance company and its insured in a tort case where there is an issue of coverage and the insurer proceeds under a reservation of rights. Some courts have taken the position that a reservation of rights in and of itself can be a conflict of interest because it creates the potential for the following instances of

disloyalty to the client represented under the reservation: (1) the insurer offering only a token defense; (2) the insurer steering the result to a judgment under an uninsured theory of recovery; and (3) the insurer gaining access to confidential or privileged information that it later will use to its advantage. *CHI of Alaska, Inc. v. Emps. Reinsurance Corp.*, 844 P.2d 1113, 1118 (Alaska 1993). *See generally* Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* 3D § 202:26 at 202–75 (2005).

Here, the conflict between the State and the individual defendants involves a strong potential for each of these instances of disloyalty, and has already required the Attorney General's Office to take positions against the interests of their individual-defendant clients, thereby making it more likely that Plaintiffs will collect a judgment against them personally. For example, the State has not only refused to agree to indemnify the individual defendants, but has filed a separate declaratory judgment action seeking to eliminate the LEF as a potential source of funds for payment of any judgment or settlement in this case. Further, the State's position is that, even if it loses the declaratory judgment action and is required to use funds from the LEF to pay part of the judgment, it will indemnify the individual defendants only up to $1,000,000, even if the City refuses to indemnify the individual defendants for the remainder of the judgment. (Brustin Decl. ¶¶ 48–51). Thus, the Attorney General's Office is taking a position in the declaratory judgment proceeding on behalf of the State that is *directly adverse* to that of the individual defendants,[1] in effect violating the prohibition in Rule 1.7 on representation that involves "the assertion of a claim by one client against another client represented by the lawyer in the same litigation or *other proceeding before a tribunal*." Mo. Sup. Ct. R. 4-1.7(b).

---

[1] The State's position that the LEF may not be used to pay any judgment arising from claims against the Board or SLMPD officers, is also adverse to the interests of members of the Board, who may be held liable in their official capacity under *Monell*. This presents another actual and disqualifying conflict of interest for counsel to the non-City defendants.

In addition, counsel for the non-City defendants, ostensibly on behalf of the Board and the living individual defendants, successfully opposed Plaintiffs' motion to appoint defendants *ad litem* for the deceased defendants—Riley, Hart, and LaGates—on the basis that they were not covered by insurance and the LEF was not available to pay any claim against the deceased defendants. (Brustin Decl. ¶¶ 14–18). As a result of counsel's efforts, there is currently no real party in interest in place of any of the defendants who were deceased prior to the filing of the Complaint, including Riley, the primary questioner during the interrogation that led to Mr. Allen's false confession. As counsel for State, which might reasonably seek to avoid being required to indemnify Riley for his misconduct, it is understandable that the Attorney General's Office would object to the appointment of a defendant *ad litem* for Riley. However, it is inconceivable that a conflict-free attorney representing any of the other living individual defendants (not the State) would have made the same decision—to effectively eliminate the ability of Plaintiffs to collect a judgment against other defendants who may be substantially responsible for Plaintiffs' damages, including the lead detective in the investigation.

The Attorney General's Office has been litigating this case as though the interests of the State, the Board, and the individual defendants were fully aligned, even though, because of the lack of indemnification, that is not so. There is little evidence that counsel has exercised independent professional judgment on behalf of each of their individual-defendant clients, some of whom may have potential cross claims against one another. For example, the discovery responses filed by the Board, James, Burford, Crow, and Wilson—all of whom were represented by the Attorney General's Office—were largely similar, if not identical. (*Id.* at ¶¶ 22–23). And during Defendant James's deposition, he admitted that, in preparing for his deposition, he did not review the testimony of any other defendant because his own testimony was "the only

[testimony] that was provided." (*Id.* at ¶¶ 33–34). Defendant Burford, too, reviewed only his own testimony in preparing for the deposition. (*Id.* at ¶ 38). Nor did Burford or James take the opportunity to observe one another's depositions—a basic step that an independent counsel normally would advise any civil defendant to take in contemplation of potential cross-claims and other defenses that could implicate other defendants. (*Id.* at ¶ 39).

**B. Concurrent representation of the Board and the individual defendants in a § 1983 action involving *Monell* claims presents an additional disqualifying actual conflict of interest.**

The Attorney General's Office's concurrent representation of individual defendants and the members of the Board in their official capacity also presents a concurrent conflict of interest, as the interests of the individual defendants and the Board are directly adverse under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978). As a result, counsel's representation of the individual defendants is substantially and materially limited by counsel's responsibilities to the Board, and vice versa. In particular, counsel for the Board cannot adequately represent its client without pursuing a defense, based on *Monell*, in which they characterize the concurrently-represented individual defendants as rogue officers acting outside the scope of their official duties and in violation of department policy when, for example, they extracted a confession from a mentally deficient suspect. In asserting this defense, counsel would necessarily steer the result in a direction that absolves the government entities of any liability and focuses on the liability of the individual defendants in their individual capacity.

Contrariwise, especially where, as here, Plaintiffs have multiple viable *Monell* theories, the individual defendants have an interest in placing blame on the relatively deeper-pocketed municipal defendants by asserting that they were acting in accordance with SLMPD policy and practice. They might even, if represented by conflict-free counsel, join Plaintiffs in seeking

13

*Monell* discovery from the relevant governmental entities and would certainly review the policies and procedures in existence to support their *Monell*-based defenses. Conflicted counsel, however, would be hesitant to adequately advise their individual clients regarding the *Monell*-based defenses available to them against their governmental client, and in fact could be ethically precluded from doing so (and from not doing so). Indeed, at Defendant James's deposition, he testified repeatedly that he did not know what the relevant policies were that were in effect at the time of Mr. Allen's interrogation, nor did he (or Burford) even review any relevant *Monell* evidence, such as official policies or practices of the SLMPD, which could have provided him with such a potential defense. (Brustin Decl. at ¶¶ 35, 38). Thus, as explained by the Minnesota Court of Appeals, under Rule 1.7[2]:

> There is an inherent conflict of interest between a city and its police officer when both are defendants in a section 1983 action, and the police officer is sued in the officer's individual capacity. As an entity the city is responsible for any constitutional deprivation that results from official policy or custom. To avoid section 1983 liability, the city must show that a police officer's action is not within the officer's official capacity. A police officer, on the other hand, avoids personal liability by showing that the actions were within the range of official capacity.

*Minneapolis Police Officers Fed'n v. City of Minneapolis*, 488 N.W.2d 817, 819–20 (Minn. Ct. App. 1992) (internal citations omitted) (noting that an "attorney who undertakes to represent both the city and a police officer in the officer's individual capacity has an actual conflict of interest and is subject to disqualification"); *see also Dunton*, 729 F.2d at 907 ("After *Monell* the interests of a municipality and its employee as defendants in a section 1983 action are in conflict").

---

[2] The Minnesota Court of Appeals analyzed the conflict under Rule 1.7 of the Minnesota Rules of Professional Conduct, which is identical to the analogous Missouri Rule as well as the ABA Model Rule of Professional Conduct 1.7 (2002).

Although courts recognize that, in certain circumstances, concurrent representation despite such a conflict may be acceptable upon consent of the parties where an agreement to indemnify effectively aligns the interests of the government entity and its officers, the Missouri Attorney General's Office cannot avail itself of this exception to disqualification where the State is seeking to escape its indemnification obligations. *See, e.g.*, *Minneapolis Police Officers*, 488 N.W.2d at 819–20 (citations omitted) ("A limited exception to this disqualifying conflict of interest arises when the city or other governmental unit . . . (1) agree[s] to indemnify the officer, and (2) take[s] legal positions consistent with the officer."); *Granberry v. Byrne*, No. CIV.A. 11-4329, 2011 WL 4852463, at *5 (E.D. Pa. Oct. 13, 2011) (concluding that plaintiff could show no actual conflict meriting disqualification because, "at no point … does the City express any intent to escape potential indemnification obligations to" the officer); *see also Opinion 552 of Advisory Comm. on Prof'l Ethics*, 507 A.2d at 236–38 (consent does not satisfy Rule 1.7 where there is "an actual conflict in a § 1983 action involving multiple representation (for example, where a governmental body refuses to indemnify its co-defendant officials or employees)").

**C. The conflicts of interest in this case cannot be waived through consent, and even if they could, there was no timely-obtained informed consent here.**

Ordinarily, "[a] lawyer . . . may represent multiple clients if it is obvious that he can adequately represent the interests of each and if each consents to such multiple representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each client." *Hechenberger v. W. Elec. Co*., 570 F. Supp. 820, 823 (E.D. Mo. 1983), *aff'd*, 742 F.2d 453 (8th Cir. 1984) (denying motion for disqualification because the interests of the lawyers' concurrent clients were not necessarily divergent); *Dairy Farmers of Am., Inc. v. Travlers Ins. Co.*, 292 F.3d 567, 574 (8th Cir. 2002) (noting that joint representation can be permitted with express consent of parties after complete

disclosure, where conflict of interest is "more technical than actual"). However, where, as here, "counsel cannot possibly fulfill his duties to each client of undivided loyalty, zealous advocacy, and independent judgment," and "counsel's duty of loyalty to one client naturally compromises his duty of loyalty to the other," the conflict cannot be waived and consent of the parties is immaterial. *State ex rel. Horn v. Ray*, 325 S.W.3d 500, 507–10 (Mo. Ct. App. 2010); *see also State ex rel. Kinder v. McShane*, 87 S.W.3d 256, 262–63 (Mo. 2002) ("[T]he trial court has an institutional interest in protecting the truth-seeking function of the proceedings over which it is presiding by considering whether the defendant has effective assistance of counsel, regardless of any proffered waiver.").

Here, because counsel for the non-City defendants have taken positions that are clearly adverse to their clients' interests—including in ways that potentially subject the individual defendants to personal liability for a multi-million dollar judgment and may give rise to malpractice claims (*see* Part IV-D, *infra*)—there is an actual conflict of interest that cannot be waived through consent. *See Opinion 552 of Advisory Comm. on Prof'l Ethics*, 507 A.2d at 236–38 (consent does not satisfy Rule 1.7 where there is "an actual conflict in a § 1983 action involving multiple representation (for example, where a governmental body refuses to indemnify its co-defendant officials or employees)").

And even if the individual clients *could* consent to the concurrent representation of adverse interests, such representation "can occur only *after* complete disclosure and with the express consent of all parties concerned." *Dairy Farmers of Am., Inc.*, 292 F.3d at 574 (emphasis added) (citing *Acorn Printing Co. v. Brown*, 385 S.W.2d 812, 817 (Mo. Ct. App. 1964)) (internal quotation omitted). Here, it is evident that no such disclosure was given, and no informed consent was obtained prior to the start of the representation. During their April 2016 depositions,

in response to pointed questioning on the topic of indemnification, James and Burford clearly testified on successive days that they understood that, in the event they were found liable for damages in the civil case, the City or the State would pay those damages on their behalf. (Brustin Decl. at ¶¶ 28–30, 37). James and Burford's counsel heard these questions and answers, but made no attempt to correct the record or confer with his client, instead permitting them to testify under the impression that they would be indemnified, and thus that their interests were aligned with the State.[3] (*Id.* at ¶¶ 31–33).

An attorney who knows that his client is testifying under the mistaken belief that he would not be held personally liable for his testimony should understand that he has a clear obligation to stop the deposition and correct his client's understanding before allowing him to proceed. Given that James's counsel not only permitted him to testify for a full day under this impression, but permitted Burford to do the same on the following day, the only reasonable assumption is that he in fact informed his clients—or at a minimum, strongly implied to them—that they would be indemnified. Indeed, non-City defendants' counsel has been litigating this case as though they never considered that the State, the Board and the individual defendants may have conflicting interests, or that the individual defendants could face personal liability, let alone fully disclose these conflicts to their individual-defendant clients.

By way of additional example, the Attorney General's Office's correspondence with Plaintiffs' counsel suggests they believed that, even if the State lost the declaratory judgment action, the LEF funds would be sufficient to cover any judgment, notwithstanding their

---

[3] It may very well be that counsel did not fully appreciate the conflict—or the position of the State vis-à-vis indemnification—which became apparent to Plaintiffs' counsel only after reading the State's declaratory judgment action. But this does not lessen the conflict; rather, it makes it less likely either that the individual defendants' interests were adequately represented as part of the concurrent representation in light of the conflict that had developed, or that the conflict had been fully disclosed and consent obtained.

understanding that it permits indemnification of up to only $1,000,000. This suggests that non-City defendants' counsel did not consider the possibility that their individual-defendant clients would be personally liable for a significant amount of money in the event of a judgment over $1,000,000, let alone obtain informed consent to joint representation notwithstanding this fact.

Nor can the conflict be cured through waiver at this late stage. Such a waiver would not be a knowing consent to the joint representation because it would be obtained after the representation has begun. The individual defendants would be consenting to a conflict that already had an effect on their defense. *See State ex rel. Horn*, 325 S.W.3d at 507–08 (holding that conflict from dual representation could not be resolved by consent or by having one client not testify). The counsel here who have been representing the individual defendants concurrently with the State are employees of the State. For that reason, the State of Missouri, in effect, already knows about any confidential and potentially inculpatory disclosures made to counsel during preparation for their depositions, if not earlier. For the same reason, it is too late to cure the conflict by promising not to disclose confidences to other clients represented in the case or by obtaining separate counsel for the individual defendants. The only way the State of Missouri could continue to represent the individual defendants is to remove the conflict now by honoring its representations, explicit or implicit, to indemnify the individual defendants.

**D. The individual defendants require independent counsel because they have viable malpractice and breach of fiduciary claims against their counsel, and equitable estoppel claims against the State.**

If the State does not agree to indemnify the individual defendants, counsel for the non-City defendants must be disqualified so that the individual defendants may be properly advised by independent counsel with respect to potential claims for either legal malpractice or breach of fiduciary duty against their current counsel, and equitable estoppel against the State for denying

them indemnification. Mr. Isaacson will likely be a key witness for any such actions, further precluding the Attorney General's Office from being permitted to continue its representation of the individual defendants.

Legal malpractice is defined in Missouri as "any misconduct or unreasonable lack of skill or fidelity in professional and fiduciary duties by an attorney." *Rodgers v. Czamanske*, 862 S.W.2d 453, 458 (Mo. Ct. App. 1993). In order to maintain a cause of action for legal malpractice a plaintiff must prove: (1) an attorney-client relationship; (2) negligence or breach of contract; (3) proximate causation of plaintiff's damages; and (4) damages to the plaintiff. *See Klemme v. Best*, 941 S.W.2d 493, 495 (Mo. 1997) (en banc).

> A legal malpractice action thus is founded on the attorney's duty to exercise due care or to honor express contract commitments. An attorney has a basic fiduciary obligation of undivided loyalty and confidentiality.

*Id.*; *see also Estate of Dean v. Morris*, 963 S.W.2d 461, 464 (Mo. Ct. App. 1998). The elements of a cause of action for breach of fiduciary duty are similar, and a suit to remedy the adverse consequences to a client that occurred as the result of an attorney's improper conduct can be characterized as either cause of action, depending on the circumstances. The primary difference is that a breach of fiduciary duty can occur either during the period of the attorney-client relationship or after it has ended; but legal malpractice is more appropriately based on conduct occurring during the period of the relationship. *Klemme*, 941 S.W.2d at 496. Proof of the attorney's intent is not required to establish a breach of fiduciary duty. *Id.* at 495–96.

The breach in this case, whether characterized as negligence or as a breach of fiduciary duty, arises from the Attorney General's Office's joint representation of defendants with conflicting interests. (*See* Part IV-A–C, *supra*). The elements of damages and proximate causation will be established for both causes of action if, for example, the Board prevails on a

*Monell* defense and the individual defendants, left without indemnification by the State, are found liable in their individual capacities for the plaintiff's damages. If the concurrent representation continues, proof of proximate cause follows necessarily from counsel's advocacy of the *Monell* defense, whether or not that defense relies on information obtained during confidential discussions with counsel. *See Lysick v. Walcom*, 258 Cal. App. 2d 136, 147–48 (Cal. Ct. App. 1968) ("[W]hen an attorney attempts dual relationship without making the full disclosure required of him, he is civilly liable to the client who suffers loss caused by lack of disclosure.").

The individual defendants might also seek to estop the State from denying indemnification. Under Missouri law:

> In order to invoke equitable estoppel there must be proof of: 1) a statement or act by government entity inconsistent with the subsequent government act; 2) the citizen relied on the act; and 3) injury to the citizen.

*Indep. Stave Co. v. Mo. Highway & Transp. Comm'n*, 702 S.W.2d 931, 935 (Mo. Ct. App. 1985). These elements are satisfied here. Counsel for the State told individual defendants or, at a minimum, strongly implied to them that they would be indemnified for any judgment against them in the civil rights case; and later, after the conflicting representation was well under way, they were told they would not be indemnified. The individual officers relied on the promise of indemnification in accepting the State's lawyers as their own in defending against the civil rights allegations in the underlying case. They have been injured already by making confidential disclosures to counsel for other defendants who have interests that are adverse to their own.

Because the party to be estopped here is the State, "in addition to satisfying the elements of ordinary estoppel, the governmental conduct complained of must amount to affirmative misconduct." *Prince v. Div. of Family Servs.*, 886 S.W.2d 68, 73–74 (Mo. Ct. App. 1994)

(citations omitted) (finding that estoppel did not prevent recoupment of mistaken overpayment of benefits to welfare recipient because there was "no proof of affirmative misconduct by the government"). The conduct of counsel from the Attorney General's Office here may satisfy that standard because it clearly violated the Rules of Professional Conduct. In addition, it was at least reckless for the State's counsel to tell or suggest to the individual officers that they would be indemnified and then proceed to obtain from them, as their lawyers, confidential information about their participation in the misconduct alleged in plaintiff's civil rights case, and permit them to testify in discovery responses and in depositions under the belief they were being indemnified.

**E.  Each of the defendants must be granted new counsel.**

The Missouri Attorney General's office cannot ethically continue to represent any of the defendants, and new, separate, and independent counsel must be appointed for the State, for the Board, and for each of the living individual defendants, at the State's expense.

The State cannot cure the conflict by assigning different lawyers from the Attorney General's Office to the case. Under Rule 4-1.10, when one lawyer in a firm is prohibited from representing a client by either Rule 4-1.7 ("Conflict of Interest: Current Clients") or Rule 4-1.9 ("Duties to Former Clients"), none of the lawyers in that firm may knowingly represent the client (with limited exceptions not applicable here). Mo. Sup. Ct. R. 4-1.10(a).

Case files for the underlying civil rights action likely are filled with the work product of current counsel—interview notes, strategy memos, and legal research—directed at a *Monell* defense. It would be difficult, if not impossible, to avoid using that information; and the ability to gain access to it alone creates an unacceptable risk that it will be used. In addition, any inculpatory disclosures the individual defendants made to counsel in confidence already are available to the State to use in furthering a *Monell* strategy on the State's behalf, and places

conflicted counsel in an untenable position with respect to both their governmental and individual clients. *See State ex rel. Horn*, 325 S.W.3d at 507 ("each client would almost certainly reveal information advantageous to one and detrimental to the other that counsel would ethically be prohibited from using").

In contrast with their current counsel, which is in the midst of an action to eliminate the LEF as a source of funding for their indemnification, truly independent counsel for the individual defendants could, among other things, evaluate and file potential cross-claims against one another, oppose the State's position in the declaratory judgment action, and potentially file separate actions for indemnification against the State, or malpractice claims against their attorneys. *See Ill. Mun. League Risk Mgmt. Ass'n v. Siebert*, 585 N.E.2d 1130, 1135–37, 1139 (Ill. Ct. App. 1992) (reversing trial court's finding in declaratory judgment action of no conflict of interest between insurer of municipality and police officer accused of civil rights violations and remanding for order that insurer pay fees of counsel personally selected by officer to assume control of litigation against him).

Even if this Court finds that conflicts exist with respect to some of the defendants but not others, counsel from the Missouri Attorney General's Office may not remain in the case. An attorney's fiduciary duty continues beyond the end of the representation. Counsel from the Attorney General's Office will have a duty of loyalty to each of their clients, and they cannot cure the conflict by withdrawing from their representation of only their clients with whom they have conflicts. The Missouri Rules of Professional Conduct establishes that a lawyer "who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person's interests are materially adverse to the

interests of the former client unless the former client gives informed consent, confirmed in writing." Mo. Sup. Ct. R. 4-1.9(a).

V.      **Conclusion**

This issue, if unresolved, has the potential to affect the integrity of the proceedings and any ultimate verdict Plaintiffs receive against the individual defendants. Because it is the interest of this Court and the public that there is confidence that any resolution of this action is obtained through a fair and equitable process, we request that this Court grant this motion to disqualify the Missouri Attorney General's Office from serving as counsel in this action.

**Dated: May 20, 2016**                                                    **Respectfully submitted,**


                                          /s/ Nick Brustin
                                          Barry Scheck, *pro hac vice*
                                          Nick Brustin, *pro hac vice*
                                          Emma Freudenberger, *pro hac vice*
                                          Farhang Heydari, *pro hac vice*
                                          Vishal Agraharkar, *pro hac vice*
                                          NEUFELD SCHECK & BRUSTIN, LLP
                                          99 Hudson St., 8th Floor
                                          New York, NY 10013
                                          nick@nsbcivilrights.com

                                          Charles A. Weiss, MO #20299
                                          Ameer Gado, MO #53363
                                          BRYAN CAVE LLP
                                          One Metropolitan Square
                                          211 North Broadway, Suite 3600
                                          St. Louis, MO 63102
                                          (314) 259-2000
                                          (314) 259-2020 [FAX]
                                          caweiss@bryancave.com
                                          aagado@bryancave.com

                                          ATTORNEYS FOR PLAINTIFFS
                                          GEORGE ALLEN, JR. AND
                                          LONZETTA TAYLOR

## CERTIFICATE OF SERVICE

I hereby certificate that on May 20, 2016, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all counsel of record.

  /s/ Nick Brustin

ATTORNEY FOR PLAINTIFFS