
Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


GEORGE ALLEN, JR., and          )
LONZETTA TAYLOR,                )
                                )
            Plaintiffs,         )
                                )Case No.
vs.                             )4:14-CV-01398 RWS
                                )
THE CITY OF ST. LOUIS,          )
MISSOURI, et al.,               )
                                )
            Defendants.         )
                                )



VIDEOTAPED DEPOSITION OF
TERRY JAMES

Taken on behalf of the Plaintiffs


Thursday, April 14, 2016










Sandra Hancock, RPR

MO CCR NO. 1119

IL CSR NO. 084-004783

1    **A.    A-z-i-z.  That was a gun possession case.**

2  **And then a Ronny -- Ronald McCabe.**

3    Q.    Okay.  And what were you accused of doing

4  in the Aziz case?

5    **A.    I do not recall.**

6    Q.    How about the McCabe case?

7    **A.    I do not recall.**

8    Q.    How many years ago were those cases?

9    **A.    Oh, I don't remember.**

10    Q.    Who represented you in those cases?

11    **A.    City counselor's office.**

12    Q.    All right.  I don't want to pry into your

13  personal -- anything more personal than I need to.

14        But do you have any health conditions that

15  might in any way affect your ability to testify?

16    **A.    No.**

17    Q.    You're not taking any medications, for

18  example, that might affect your memory?

19    **A.    No.**

20    Q.    And as far as you know, your memory is

21  fine; fair to say?

22    **A.    Yes.**

23    Q.    How old are you, sir?

24    **A.    62.**

25    Q.    What have you done to prepare for today?

¹ And, first, what I mean by that is what

² documents have you reviewed in preparation for today?

³ **A.    I reviewed my testimony in a trial setting.**

⁴ **I reviewed the testimony or a portion of the police**

⁵ **report that I was involved in, and then also a**

⁶ **deposition that was taken.**

⁷     Q.    Okay.  What deposition?

⁸     **A.    Deposition of my testimony.**

⁹         MR. ISAACSON:  If I may, it might clear it

¹⁰ up.

¹¹         The motion to suppress hearing, I believe,

¹² is that the testimony you're referring to?

¹³         THE WITNESS:  Yes.  Yes.

¹⁴         MR. ISAACSON:  Okay.

¹⁵         MR. BRUSTIN:  And feel free to do that at

¹⁶ any time.  That's fine.  Okay.  Thank you.

¹⁷     Q.    (By MR. BRUSTIN)  No other documents that

¹⁸ you reviewed?  No other pieces of paper that you

¹⁹ looked at or read?

²⁰     **A.    Yes.  A number of documents that were**

²¹ **provided to me by my attorney.**

²²     Q.    Okay.  And what documents did you look at?

²³     **A.    Let's see.  The interrogatories, the**

²⁴ **stipulations of facts.**

²⁵         THE WITNESS:  Help me here.  What else?  I

1   looked at a lot of them.

2          MR. ISAACSON:  I would be glad to.  I

3   believe he looked at the transcript of the confession,

4   as per your request.  I believe he has listened to the

5   audio version; is that correct?

6          THE WITNESS:  That's correct.

7          MR. ISAACSON:  There was a two-page memo by

8   the investigator from the Attorney General's office in

9   2011.  I believe he has reviewed that.  Is that fair?

10         THE WITNESS:  Yes, that's correct.

11         MR. ISAACSON:  I think we're pretty close

12  to complete.

13      Q.   (By MR. BRUSTIN)  If anything else comes to

14  mind, please let me know.  Feel free to -- feel free

15  to put it on the record.

16         Also at any time if you remember something

17  new or different, you should feel free to make that

18  correction.  We're talking about events that happened

19  quite a while ago.

20      A.   Yes.

21      Q.   All right.  Have you met with any attorneys

22  in preparation for today?

23      A.   Yes.

24      Q.   Who have you met with?

25      A.   Bob Isaacson.

1    **A.    Just he.  And, yes, I have.**

2    Q.    Okay.  How long -- how long did you speak

3    to him on the phone about the case?

4    **A.    Oh, the conversations were normally very**

5    **brief.**

6    Q.    Okay.

7    **A.    Maybe --**

8    Q.    Less than an hour, total?

9    **A.    Oh, yes.  Yes.**

10    Q.    All right.  Mr. James, you understand that

11    you are one of the people who's being sued

12    individually in this case.

13            You understand that, correct?

14    **A.    Yes.**

15    Q.    And you understand that we are claiming

16    that Mr. Allen spent many years in prison as a result

17    of misconduct by you and others.

18            You understand that?

19    **A.    Yes.**

20    Q.    And you understand that if we're

21    successful, there could be a judgment against you and

22    others for many millions of dollars?

23    **A.    Yes.**

24    Q.    Do you have an understanding, as you sit

25    here today, from any source, as to whether or not the

1   state or the city will be paying any judgment against

2   you?

3        **A.    I do not.**

4        Q.   Okay.  Have you spoken to anybody about

5   that?

6        **A.    I have.**

7        Q.   All right.  What's your understanding as to

8   what will happen if there's a judgment entered against

9   you?

10        **A.    The city or the state will be -- will cover**

11   **me --**

12        Q.   Okay.

13        **A.    -- cover my expenses.**

14        Q.   And let's be -- I want to be very clear

15   because this is important.  It's going to be really

16   important, potentially, to you.

17            It's your understanding, based on your

18   communications with your attorney or others, that

19   either the city or the state or both will be paying

20   any damages that are assessed against you; is that

21   correct?

22            MR. ISAACSON:  Let me just object to the --

23            MR. BRUSTIN:  I'm -- okay.

24            MR. ISAACSON:  Because you did ask based on

25   conversations with me, I think that needs to be

1   withdrawn from the question.

2           MR. BRUSTIN:  Let me withdraw the question.

3       Q.  (By MR. BRUSTIN)  What is your

4   understanding from any source in the world --

5   withdrawn again.

6           I take it it's your understanding, from

7   speaking to sources either from the city or the state,

8   that should you be found liable in this case and

9   damages assessed against you, it's your understanding,

10  based on those communications, that the city and/or

11  the state will be paying all the damages assessed

12  against you.  Is that correct?

13      **A.    Yes.**

14      Q.  You've received those assurances?

15      **A.    (No audible response.)**

16      Q.  That's your understanding?

17      **A.    Yes.**

18      Q.  Okay.  Have you received anything in

19  writing to that effect?

20      **A.    No, I don't believe I received anything**

21  **writing.**

22      Q.  Okay.  You were just told that orally?

23      **A.    Well, there was a -- there was a document**

24  **that I read.  I don't exact -- I don't remember**

25  **exactly what it was.  But that was my understanding**

1  **after I read it.**

2       Q.   Okay.  And that's your understanding as you

3  sit here today; that should any damages be assessed

4  against you, should you be found liable and we receive

5  damages, let's say for $5 million, you understand that

6  the city and/or the state will be paying that?

7       **A.   Yes.**

8            **(Whereupon, the court reporter marked**

9  **Plaintiff's Exhibit No. 1, Memo dated 11-17-2011,**

10 **Martin to File, for identification.)**

11           MR. BRUSTIN:  All right.  Let's mark this,

12 please, as -- I can do it.  We'll mark this as --

13 we'll call it James 1.  I think we're probably going

14 to go -- we're probably not going to do separate

15 exhibits for each deponent, but we'll see.  So let's

16 start with this, though, Mr. James.

17           There you go.  Big table.

18           MR. ISAACSON:  Okay.  So what did we say;

19 Exhibit 1 or James 1?

20           MR. BRUSTIN:  We'll call this James 1

21 because that's how it's marked.  You know what?  I'm

22 going to call this Exhibit 1, and we can just -- it

23 says James on there, but we're going to call this

24 Exhibit 1.  That's fine.  You keep it.

25           We'll call this Plaintiff's Exhibit 1.  All

1    **A.    Yes.**

2        Q.    Now, the one thing that -- let me just make

3    sure I'm clear on this.

4            You told them that, to your knowledge,

5    there was nothing improper that happened between

6    Mr. Allen and the police officers that you observed,

7    correct?

8    **A.    Correct.**

9        Q.    And you stand by that.  Your memory has

10   stayed the same on that, correct?

11   **A.    Yes.**

12       Q.    As far as you can recall, this one was done

13   by the books, right?

14   **A.    Yes.**

15       Q.    There were no violations of policy or

16   practice that you observed, correct?

17   **A.    That is correct.**

18       Q.    Or that you heard about, correct?

19   **A.    Correct.**

20       Q.    I'm going to get back to that in a few

21   minutes again, but let me ask you.  Let me first ask

22   you some more general questions.

23           You told me how old you were.  Again?  I'm

24   sorry.

25   **A.    62.**

1    fair to say more than 50 of those?

2         A.    I have no idea.

3         Q.    Are you aware of any cases that you were

4    involved in as an investigator or a police officer

5    where somebody was convicted, and that conviction was

6    later vacated, other than George Allen's case?

7         A.    No.

8         Q.    Now, it sounds like in preparation for

9    today, you did our very best to prepare yourself; fair

10   to say?

11        A.    Yes.

12        Q.    And one thing you didn't read was the

13   testimony of other people, correct?  You only read

14   your own testimony?

15        A.    That is correct.

16        Q.    Why is that?

17        A.    That's the only thing that was provided to

18   me.

19        Q.    Okay.  Now, based on what you've read, do

20   you have a belief, as you sit here today, as to

21   whether or not George Allen committed this crime?

22        A.    Yes.

23        Q.    Okay.  What's your brief?

24        A.    That he did not.

25        Q.    You -- you -- you believe that George Allen

1      A.    Could be.

2      Q.    All right.  The other thing that Mr. Skaggs

3  told us was that a very common principle in

4  interviewing suspects or interrogating suspects was to

5  try to get information from the suspect that only the

6  police and the real perpetrator could know.

7            Is that consistent with your understanding

8  of policy and protocol back in 1982?

9      A.    I don't know what the policy protocol was

10  for interrogations back then.  I was a uniformed

11  police officer.

12      Q.    Okay.  But you certainly knew, as a matter

13  of common sense, that that was an important thing to

14  do if you could.  When you're interviewing a suspect

15  and trying to determine whether or not they committed

16  a crime, you're trying to get information from that

17  suspect that only the police or the perpetrator, the

18  actual perpetrator would know, correct?  That's just

19  common sense.

20      A.    Now, are you asking me this question what I

21  knew in 1982, or what I know now?

22      Q.    I'm asking what you knew in 1982.  As a

23  matter of common sense, you understand that if

24  possible --

25      A.    In 1982 --

1  handwriting, the second best thing is write it and

2  have them sign it, correct?

3      **A.    That's correct.**

4      Q.   If they won't do either of those things or

5  are unable to do either of those things, the third

6  option is to tape it, right?

7      **A.    Correct.**

8      Q.   And that's the policy as you understood it

9  in 1982, at least, correct?

10     **A.    Based on this curriculum, correct.**

11     Q.   Okay.  And it's your understanding,

12  although you didn't know it, that was the policy in

13  1982, correct?

14         MR. ISAACSON:  Let me just object

15  foundationally.  Go ahead.

16     **A.    I don't know what their policy was in**

17  **homicide in 1982.  I have no way of knowing.**

18     Q.   You have no reason to believe -- you have

19  no reason to believe that this training marked a

20  policy change in the department in 1983, as compared

21  to 1982, correct?

22     **A.    I don't know what their policy was in**

23  **homicide at the time.  I don't.**

24     Q.   As far as you were trained, at least as

25  early as 1983, your understanding was the protocol in

1    Q.   All right.  In 1984 when you were a

2  detective, if this same thing had happened -- if

3  George Allen had made admissions to LaRose about other

4  crimes, taken them back, couldn't provide any details,

5  subsequently made admissions about the Bell homicide

6  that were believed sufficiently credible to be arrest

7  him -- you would fully expect, pursuant to the

8  policies and practices of the department at that time,

9  that there would be a full investigation to determine

10  whether or not he was involved in those other crimes,

11  correct?

12    **A.   I don't know what the policy was at that**

13  **time for them.  I have no idea.**

14    Q.   I'm asking about 1984 when you were a

15  detective.

16    **A.   Would I want that information?**

17    Q.   Of course you want that information, right?

18    **A.   Or what the policy was?**

19    Q.   Both.

20    **A.   I have no idea what their policy was.**

21    Q.   Certainly you'd want that information,

22  correct?

23    **A.   Yes.**

24    Q.   And you would understand that perhaps

25  George Allen committed other those crimes and it would